Fred W. Alvarez (SBN 68115)
Allison B. Moser (SBN 223065)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone: 650.739.3939
Facsimile: 650.739.3900
Email: falvarez@jonesday.com
          amoser@jonesday.com

Matthew W. Lampe (SBN 4620852) (pro hac vice)
JONES DAY
222 East 41st Street
New York, NY 10017-6702
Telephone: 212.326.3939
Facsimile: 212.755.7306
Email: mlampe@jonesday.com

Lawrence C. DiNardo (SBN 3128594) (pro hac vice)
Elizabeth B. McRee (SBN 6275501) (pro hac vice)
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
Telephone: 312.782.3939
Facsimile: 312.782.8585
Email: emcree@jonesday.com

Attorneys for Defendants McDonald's Corporation,
McDonald's USA, LLC and McDonald's Restaurants
of California, Inc.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

| | |
|---|---|
| STEPHANIE OCHOA, ERNESTINA SANDOVAL, YADIRA RODRIGUEZ, and JASMINE HEDGEPETH, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MCDONALD'S CORP., a corporation, MCDONALD'S U.S.A., LLC, a limited liability company, MCDONALD'S RESTAURANTS OF CALIFORNIA, INC., a corporation, THE EDWARD J.  SMITH AND VALERIE S. SMITH FAMILY LIMITED PARTNERSHIP d/b/a MCDONALD'S, a limited partnership, and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO.  3:14-cv-02098-JD <br><br> **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS MCDONALD'S USA, LLC, MCDONALD'S CORPORATION, AND MCDONALD'S RESTAURANTS OF CALIFORNIA, INC.** <br><br> Date:        Wed., June 24, 2015 <br> Time:        9:30 a.m. <br> Courtroom:   11 <br> Judge:       Hon. James Donato <br><br> Complaint Filed:  March 12, 2014 <br> Trial Date:       September 14, 2015 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEY(S) OF RECORD:

PLEASE TAKE NOTICE that at 9:30 a.m. on Wednesday, June 24, 2015, or as soon thereafter as this matter may be heard, in Courtroom 11, 19th Floor, of the above-captioned court at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants McDonald's USA, LLC ("McDonald's USA"),  McDonald's Corporation ("McDonald's Corp."), and McDonald's Restaurants of California, Inc. ("McDonald's of California") (collectively the "McDonald's Defendants") will, and hereby do, move this Court for an order granting summary judgment in their favor and against plaintiffs Stephanie Ochoa, Ernestina Sandoval, Yadira Rodriguez, and Jasmine Hedgepeth ("Plaintiffs") pursuant to Federal Rule of Civil Procedure 56 and Northern District of California Civil Local Rules 7-2, 7-4, and 56.

The McDonald's Defendants seek summary judgment against Plaintiffs on the grounds that the record evidence confirms that: (i) they are not a joint employer with, or principals of, Edward J. Smith and Valerie S. Smith (identified in the Complaint as the Edward J. Smith and Valerie S. Smith Family Limited Partnership ("Smith")); (ii) they neither owe any duty of care nor have breached any such duty to Plaintiffs to allow Plaintiffs to state a claim of negligence; (iii) there is no evidence sufficient to state a claim under any unlawful conspiracy or aiding and abetting theory; and (iv) there are no genuine issues of material fact regarding these questions, and therefore the McDonald's Defendants are entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Bruce Steinhilper, the Declaration of Elizabeth B. McRee, filed and served herewith, all of the pleadings and papers on file in this matter, and upon such further evidence and argument as may be presented at the hearing of this Motion.

1    Dated: May 20, 2015                         Respectfully submitted,

2                                                JONES DAY

3

4                                                By: _____/S/ Elizabeth B. McRee_____
                                                     Elizabeth B. McRee
5                                                Counsel for Defendants
                                                 MCDONALD'S CORPORATION
6                                                MCDONALD'S USA, LLC
                                                 MCDONALD'S RESTAURANTS OF
7                                                CALIFORNIA, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**TABLE OF CONTENTS**</u>

Page

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 2

       A.    McDonald's USA's Franchise Relationship With Smith ....................... 2

       B.    Additional Resources Made Available to Smith as a McDonald's
             Franchisee ............................................................................................. 5

       C.    Smith's Restaurant Operations And Employment Practices.................. 6

       D.    Plaintiffs' Employment At Smith's Franchise Restaurants .................... 7

III.   ARGUMENT ...................................................................................................... 10

       A.    The Undisputed Record Evidence Establishes That the McDonald's
             Defendants Are Not Plaintiffs' Employer or Joint Employer................ 11

             1.    Smith, and Not the McDonald's Defendants, Interviewed Plaintiffs,
                   and All Employees at Its Franchised Restaurants, and Decided
                   Whether To Hire Them ............................................................... 14

             2.    Smith, and Not the McDonald's Defendants, Determined the
                   Compensation For Plaintiffs and All Employees at Its Franchised
                   Restaurants ............................................................................... 14

             3.    Smith, and Not The McDonald's Defendants, Trained Plaintiffs on
                   How to Perform Their Job Duties ............................................. 15

             4.    Smith, and Not the McDonald's Defendants, Determined the Work
                   Schedules for Plaintiffs, and All Employees at Its Franchised
                   Restaurants, and Controlled Their Job Assignments Each Day ... 15

             5.    Smith, and Not the McDonald's Defendants, Was Responsible For
                   Ensuring Plaintiffs and All Employees at Its Franchised Restaurants
                   Correctly Recorded Their Time ................................................. 15

             6.    Smith, and Not the McDonald's Defendants, Enforced Meal Period
                   and Rest Break Policies at Its Franchised Restaurants................ 16

             7.    Smith, and Not the McDonald's Defendants, Evaluated the
                   Performance of Employees and Enforced Work Rules.............. 16

             8.    Smith, and Not the McDonald's Defendants, Maintained a Payroll
                   Bank Account in California for the Payment of Wages to Plaintiffs
                   and All Its Employees ............................................................... 16

       B.    The Undisputed Record Evidence Establishes That Smith Is Not an Agent
             of the McDonald's Defendants ............................................................ 17

       C.    The Operational Requirements of McDonald's USA, and the Resources It
             Makes Available, Do Not Create an Employment or Principal-Agent
             Relationship ......................................................................................... 19

       D.    Plaintiffs Cannot as a Matter of Law Sustain Their Claims of Negligence,
             Conspiracy, and Aiding and Abetting................................................... 23

       E.    McDonald's of California and McDonald's Corp. Play No Role in Smith's
             Operations ............................................................................................ 24

IV.    CONCLUSION.................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

CASES

4

*Aleksick v. 7-Eleven, Inc.*
   205 Cal. App. 4th 1176 (2012) .......................................................................13, 23

5

6

*Braboy v. Staples,*
   No. C 09-4534 PJH, 2011 U.S. Dist. LEXIS 181116 (N.D. Cal. Feb. 24, 2011) ...............12, 18

7

8

*Carillo v. Schneider Logistics, Inc.,*
   Case No. 11-cv-8557 (C.D. Cal. May 13, 2013) (McRee Decl. Ex. T)..............................23, 24

9

10

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)........................................................................................10, 11

11

12

*Chetal v. American Home Mortg.,*
   2009 WL 2612312 (N.D. Cal. Aug. 24, 2009).........................................................24

13

14

*Cislaw v. Southland Corp.,*
   4 Cal. App. 4th 1284 (1992) .............................................................................18, 20

15

16

*Courtland v. GCEP-Surprise, LLC,*
   No. 12-cv-349, 2013 WL 3894981 (D. Ariz. July 29, 2013)....................................23

17

18

*Devereaux v. Abbey,*
   263 F.3d 1070 (9th Cir. 2001)...............................................................................11

19

20

*Dudley v. 4-McCar-T, Inc.,*
   2011 U.S. Dist. LEXIS 48076 (W.D. Va. 2011), *aff'd,* 458 Fed. App'x 235
   (4th Cir. 2011)....................................................................................................13

21

22

*Dufour v. Be LLC,*
   2010 WL 431972 (N.D. Cal. Feb. 2, 2010) ...........................................................24

23

24

*Field v. Am. Morg. Exp. Corp.,*
   2011 U.S. Dist. LEXIS 84601 (N.D. Cal. Aug. 2, 2011)..........................................20

25

26

*Gray v. McDonald's USA, LLC,*
   874 F. Supp. 2d 743 (W.D. Tenn. 2012)................................................................13

27

*Jones v. Cnty. of L.A.,*
   99 Cal. App. 4th 1039 (2002) ...............................................................................11

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Juarez v. Jani-King of Calif., Inc.*,
    No. 09-3495-SC, 2012 U.S. Dist. LEXIS 7406 (N.D. Cal. Jan. 23, 2012)...................13, 14, 20

4

5

*Martinez v. Combs*,
    49 Cal. 4th 35 (2010) .....................................................................................................11, 12

6

7

*Mosley v. McDonald's Corp.*,
    No. 05-CV-7290, 2008 WL 1883451 (N.D. Ill. Apr. 25, 2008) ..............................................13

8

9

*Patterson v. Domino's Pizza, LLC*,
    60 Cal. 4th 474 (2014) ...................................................................................................... passim

10

11

*Perez v. State Farm Mut. Auto. Ins. Co.*,
    No. 06-cv-01962, 2011 WL 5833636 (N.D. Cal. Nov. 15, 2011) ...........................................24

12

13

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
    48 Cal. 3d 341 (1989) ...........................................................................................................12

14

15

*Singh v. 7-Eleven, Inc.*,
    No. C-05-04534-RMW, 2007 WL 715488 (N.D. Cal. Mar. 8, 2007) ...................11, 13, 15, 17

16

17

*Vann v. Massage Envy Franchising LLC*,
    No. 13-cv-2221, 2015 WL 74139 (S.D. Cal. Jan. 6, 2015) ............................................. passim

18

**STATUTES**

19

Cal. Labor Code § 2699 ....................................................................................................23

20

Cal. Labor Code § 1194 ...............................................................................................11, 13

21

**OTHER AUTHORITIES**

22

Fed. R. Civ. P. 56 .............................................................................................................10

23

IWC Wage Order 5 ...........................................................................................................11

24

25

26

27

28

1    **I.      INTRODUCTION**

2            The California Supreme Court has squarely held that a franchisor is not vicariously liable

3    for the employment decisions of its franchisees unless it has a "'comprehensive and immediate

4    level of day-to-day authority' over matters such as hiring, firing, direction, supervision, and

5    discipline of the employee." *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 499 (2014)

6    (quoting *Vernon v. State of California*, 166 Cal. App. 4th 114, 127-28 (Cal. 2004)).  In setting this

7    standard, the Court recognized that a franchisor/franchisee relationship by definition leaves

8    certain rights and responsibilities with the franchisee, and where the franchisor does not tread, it

9    shares no joint liability or accountability with the franchisee – to hold otherwise would undermine

10   the core economic relationship between the parties to the franchise agreement. *Id*. at 497-98.

11           Here, the undisputed facts establish that McDonald's USA, LLC ("McDonald's USA"),

12   McDonald's Corporation ("McDonald's Corp."), the parent company of McDonald's USA, and

13   McDonald's Restaurants of California, LLC ("McDonald's of California") (together the

14   "McDonald's Defendants") did not "enter the arena" of hiring, firing, wages, hours, payroll, or

15   other terms and conditions of employment, and neither had authority nor exercised authority in

16   these areas over the franchisee's employees.  The franchise agreements and related documents

17   between McDonald's USA and Edward Smith and Valerie Smith (identified in the Complaint as

18   the Edward J. Smith and Valerie S. Smith Family Limited Partnership ("Smith"))[1], undisputed

19   testimony from Smith's management and McDonald's USA, and testimony from Plaintiffs

20   themselves, all establish that Smith alone controlled the terms and conditions of Plaintiffs'

21   employment.  Smith hired Plaintiffs and all other employees at its restaurants.  Smith alone set

22   Plaintiffs' wage rates, orchestrated their training, set their schedules, made available their meal

23   periods and rest breaks, paid their wages, and enforced workplace rules.  The McDonald's

24   Defendants did not carry out, and did not have authority to carry out, any of these functions.

25   _____

26           [1] The Franchise Agreements relevant to this case are between McDonald's USA and
     Edward and Valerie Smith, with the exception of one Franchise Agreement that was recently
     transferred to their son, Michael Smith.  Plaintiffs, however, have sued the Edward J. Smith and
27   Valerie S. Smith Family Limited Partnership.  Because there is no meaningful distinction between
     the individual franchise owners and their family partnership for the purpose of this motion, they
28   are referred to here both individually and collectively as "Smith."

Further, the fact that Smith is required to use certain equipment and technology for production, sales, and other transactions; undertake certain training on standards and expectations; submit to periodic business reviews; and may use optional resources provided by McDonald's USA does not equate to the McDonald's Defendants having a "comprehensive and immediate level of day-to-day authority" over employment decisions in the Smith restaurants. The California Supreme Court has expressly held that franchisors, like McDonald's USA, have a right to protect their brand by implementing and enforcing standards on franchisees, *id*. at 498 n.21, including but not limited to implementing a business plan, which may involve "[a] long list of marketing, production, operational and administrative areas," taking "the form of printed manuals, training programs, advertising services, and managerial support, among other things." *Id*. at 489-90 (internal citations omitted).  These types of standards at franchised locations are "not, standing alone, sufficient to impose 'employer' or 'principal' liability on the franchisor" for employment-related decisions of the franchisee or its managers.  *Id*. at 498 n.21.

The contractual obligations McDonald's USA imposes on Smith and the additional optional resources it provides do not come close to the comprehensive and immediate level of daily authority required to create either a joint employment or principal-agent relationship, and are consistent with the governing precedent that holds franchisors are not vicariously liable for the decisions of franchisees.  Similarly, the record evidence does not support any alternative theory of liability, including negligence or conspiracy, because there is no evidence the McDonald's Defendants knew of, could control, or in any way encouraged any violation of the law by Smith.  The undisputed record evidence thus confirms that the McDonald's Defendants are entitled to summary judgment on Plaintiffs' claims.

## II.     BACKGROUND

### A.     McDonald's USA's Franchise Relationship With Smith

McDonald's USA is the franchisor for McDonald's restaurants in the United States. (Decl. of Bruce Steinhilper ("Steinhilper Decl.") ¶ 4.)  From the founding of McDonald's Corp., and continuing after the creation of McDonald's USA in 2005 as the sole franchising entity for McDonald's restaurants in the U.S., the franchise business model has been the mechanism for the

1    growth of the McDonald's brand, which has always been viewed as the most valuable asset of the

2    enterprise.  (*Id.* ¶ 6.)  This model has driven the expansion of McDonald's-branded products and

3    services while allowing small local business owners to leverage the resources provided by

4    McDonald's USA to establish their own successful businesses.  (*Id.* ¶ 7.)  Through a franchise

5    agreement – which typically has a 20-year duration and can be terminated only for material

6    breach, such as the failure to make required payments (Decl. of Elizabeth McRee ("McRee

7    Decl.") Ex. J-N (Smith Dep. Exs. 60-64, Smith Franchise Agreements (collectively, "Fr. Agr."))

8    ¶¶ 2, 18, 20) – McDonald's USA provides franchisees with a license to use the McDonald's

9    name, trademark, and business practices, along with an established method of operating a

10    successful restaurant.  (Steinhilper Decl. ¶¶ 8-9.)  However, the execution of a business plan and

11    operation of the business remain solely under the control of the franchisees.  (*Id.* ¶ 9.)

12          McDonald's USA and Smith are parties to separate          franchise agreements for each

13    of the five Smith franchise restaurants (collectively the "Franchise Agreements") in Oakland and

14    Richmond, California.[2]  (Fr. Agr. ¶ 2.)  The Franchise Agreements define the relationship

15    between the parties, stating that Smith ███████████████████████████████

16    ████████████████        (*Id.* ¶ 16.)  The Franchise Agreements also make clear that the parties

17    ████████████████████████████████████████████████

18    ████████████████████████████████████████████████

19    ██████████████████████████        (*Id.*)

20          The Franchise Agreements also provide the requirements and standards Smith must meet

21    to maintain the franchise, and McDonald's USA's obligations to Smith in return.  ████████

22    ████████████████████████████████████████████████

23    ████████████████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████████████████████████████

26    As an independent business owner, Smith is required to ██████████████████

27

28         [2] Edward and Valerie Smith transferred one of these restaurants – the franchise at 1330
Jackson Street in Oakland – to their son Michael Smith in April 2014.  (Smith Dep. 18:3–14.)

1   ████████████████████████████ (Fr. Agr. ¶ 13), and ████████████████

2   ████████████████████████████████ (*id.* ¶ 12(g)).  The Franchise

3   Agreements further require Smith, like all McDonald's franchisees,██████████████

4   ██████████████████████████████████ (*Id.* ¶ 1.)  In particular,

5   ██████████████████████████████████████████

6   (McRee. Decl. Ex. H (Tr. of Dep. of Michael Lewis, April 8, 2015 ("Lewis Dep.")) 44:9-10,

7   63:9–17).████████████████████████████ (*id.* 60:7-61:18),

8   ██████████████████████████████ *id.* 63:20–23).

9           In exchange for the service fees paid by Smith, the Franchise Agreements require

10  McDonald's USA to provide certain resources that allow Smith to be a successful business

11  owner.  For instance, ██████████████████████████████

12  ██████████████████████████████████████

13  ██████████████████████████████████████

14  ██████████████████████████████████

15  ████████████████████ (McRee Decl. Ex. E (Tr. of Dep. of Michael Smith,

16  March 19, 2015 ("Smith Dep.")) 180:21-181:10; McRee Decl. Ex. G (Tr. of Dep. of Bruce

17  Steinhilper, April 7, 2015 ("Steinhilper Dep.")) 47:25-49:4; McRee Decl. Ex. I (Smith Dep. Ex.

18  45) at 6).  McDonald's USA likewise makes its principal training resource, Hamburger

19  University, available to Smith and the general managers of Smith restaurants, and requires that

20  every restaurant have at least one graduate of Hamburger University.  (Fr. Agr. ¶ 6.)

21          The Franchise Agreements also oblige McDonald's USA to provide field support staff,

22  called "business consultants," to visit Smith's restaurants to advise and consult on operational,

23  marketing, and general business subjects, and to ensure compliance with the quality, service, and

24  cleanliness standards of McDonald's USA's business format.  (Fr. Agr. ¶ 3; Steinhilper Dep.

25  119:6-14, 132:25-133:16; McRee Decl. Ex. S (Tr. of Dep. of Steven Dubois, May 12, 2015

26  ("Dubois Dep.")) 23:11-19, 54:23-55:2.)  Smith at all times is free to reject any business advice it

27  receives from Consultants (Smith Dep. 193:20-194:10; Dubois Dep. 263:23-264:4), and

28  Consultants cannot make staffing decisions (Steinhilper Dep. 125:18-127:3, 221:2–18) or access

1  Smith's crew schedules or payroll reports (Smith Dep. 60:10–15, 64:11–14; McRee Decl. Ex. F

2  (Tr. of Dep. of Guadalupe Ortega, March 20, 2015 ("Ortega Dep.")) 54:8-19, 129:10-25).

3      Consultants also review Smith's franchise restaurants based on the National Franchising

4  Standards, a set of metrics and guidelines used to guide future franchising decisions with Smith

5  and other franchisees, including ███████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████  (Steinhilper Dep. 165:10-17; McRee Decl. Ex. P (Steinhilper Dep. Ex. 109) at 1.)

8  Because the National Franchising Standards are not part of the Franchise Agreements, and ███

9  ████████████████████████████████████████████████████████████████████

10  ████████████████████  McDonald's USA cannot contractually enforce compliance with the

11  standards on Smith.  (Steinhilper Dep. Ex. 109 at 1.)  Rather, Consultants are instructed that the

12  purpose of the reviews, which during the alleged class period, included graded and ungraded

13  visits to the restaurants called Full Operations Reviews (FOR) and Short Operations Reviews

14  (SOR) (Steinhilper Dep. 186:16-189:1; Ortega Dep. 48:17-50:2; Dubois Dep. 77:5-9), ████

15  ████████████████████████████████████████████████████  (McRee Decl. Ex.

16  Q (Steinhilper Dep. Ex. 113) at 54.)  ████████████████████

17  ███████████████████████████████████████  (*Id.*)

18      **B.      Additional Resources Made Available to Smith as a McDonald's Franchisee**

19      Though Smith has bargained for access to and use of certain optional technology and

20  software resources as part of the Franchise Agreements, and McDonald's USA encourages their

21  use, McDonald's USA has no authority to compel Smith to use the resources.  For example, the

22  time keeping and scheduling functions of the ISP are discretionary for franchisees, as are the

23  ISP's other back office functions such as cash management, inventory, and payroll.  (Lewis Dep.

24  79:7–9; Smith Dep. 193:4-15.)  Smith, and all franchisees, have discretion to use or not use any or

25  all of those functions, or to start and stop their use, to use them to varying degrees, or to use them

26  in conjunction with other business resources not part of the ISP technology.  (*Id.*) ███████

27  ████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████

1　███████████████████████████████████████████████████████

2　████████████████████████████████████████████████████

3　██████████████████████████████████████████████████

4　　　███████████████████████████████████████████████

5　██████████████████████████████████████████████████████████

6　█████████████████████████████████████████████████████████

7　██████████████████████████████████████████████████████████

8　███████████████████████████████████████████████████

9　███████████████████████████████████  Smith at all times controls whether to

10　purchase R2D2, what reports (if any) to receive, and how (if at all) to use the data in those

11　reports.  (Steinhilper Decl. ¶ 10.)

12　　　　Likewise, McDonald's USA provides franchisees with training and electronic learning

13　resources to help franchisees improve restaurant operations.  While McDonald's USA encourages

14　franchisees to take advantage of these training opportunities, Smith is not contractually required

15　to use this training, and Smith decides who attends or receives the training, if anyone.  (*Id.*)

16　　　**C.**　　**Smith's Restaurant Operations And Employment Practices**

17　　　　Smith, and not the McDonald's Defendants, is responsible for selecting, interviewing, and

18　hiring prospective employees at each of the restaurants it operates.   (Smith Dep. 185:1-186:2;

19　187:2-11; Ortega Dep. 19:21-20:4.)  As part of the hiring process, Smith participates in an

20　optional fee-based service provided by a third-party vendor (Aon Corporation ("Aon")) called

21　"Hiring to Win," which includes an online assessment of job applicants.  (Smith Dep. 76:22-77:3,

22　185:1-186-2.)  The online assessments of applicants conducted by Aon are reported to Smith, and

23　Smith freely accepts or rejects the results as the organization sees fit. (*Id.* 185:1-15.)  Either

24　Michael Smith or Guadalupe Ortega, the Smith organization's supervisor, conducts all interviews

25　and makes all hiring decisions.  (Smith Dep. 187:2-11; Ortega Dep. 19:21-20:4.)

26　　　　Smith alone controls all aspects of the terms and conditions of crew members'

27　employment.  Smith determines each crew member's hourly wage rate.  (Smith Dep. 187:12-20;

28　Ortega Dep. 22:21-23:5.)  Smith is responsible for training crew members.  (Ortega Dep. 19:12-

23.)  Smith provides uniforms to crew members and sets its own policy for uniform maintenance. (Smith Dep. 64:20-65:13.)  Smith sets work schedules of crew members (*id.* 189:19-190:3, 192:13-15), determines specific work assignments of crew members (*id.* 187:21-24, 190:7-10), and ensures that crew members are afforded meal periods and rest breaks (*id.* 33:11-15, 190:13-15).  Only Smith, and not the McDonald's Defendants, can edit crew member time records. (Smith Dep. 96:14-18, 190:16-20; Ortega Dep. 90:3-92:15.)  And, Smith, not the McDonald's Defendants, evaluates Smith's employees (Smith Dep. 189:8-18), and makes decisions regarding promotions to management positions (Smith Dep. 188:4-8; Ortega Dep. 21:24-25).

Until about September 2013, Smith contracted with the firm ABC Inc. for payroll services.  (Smith Dep. 23:9-24:13, 103:4-17, 107:1-6.)  In September 2013 Smith replaced ABC with Mize Houser, the payroll processor it uses currently.  (*Id.*)  During the period it used ABC, a Smith owner or employee – usually Valerie Smith – would receive time records from the restaurants and manually type and transmit the time record data contained in those records to ABC.  (*Id.* 21:4-14.)  Under its current system with Mize Houser, payroll information is transmitted electronically from Smith to Mize Houser to generate payroll and effectuate the payment of wages.  (*Id.* 87:18-25.)  The McDonald's Defendants have never participated in the administration of payroll, timekeeping, time punch corrections, transmittal, or calculation or payment of wages.  (*Id.* 190:16-20.)  The McDonald's Defendants have no access to or control of Smith's payroll system or bank accounts.  (*Id.* 190:24-191:1.)  None of the McDonald's Defendants has ever been listed as an employer on Smith's paychecks.  (*Id.* 109:16-18.)

### D.  Plaintiffs' Employment At Smith's Franchise Restaurants

Plaintiff Stephanie Ochoa worked at the Smith restaurant at 6623 San Pablo Avenue in Oakland from July 2013 to February 2014.  (Dkt. No. 40, First Am. Compl. ("FAC") ¶ 8.) Plaintiff Yadira Rodriguez worked at the Smith restaurant at 2301 MacDonald Street in Richmond from June 2013 to August 2014.  (FAC ¶ 10.)  Plaintiff Jasmine Hedgepeth worked at the Richmond restaurant from April 2012 until October 2013, and then at the Smith restaurant at 4515 Telegraph Avenue in Oakland from October through December 2013.  (*Id.* ¶ 11.)  Plaintiff Ernestina Sandoval has worked at the Richmond restaurant since May 2013.  (*Id.* ¶ 9.)

1           <u>Smith interviewed and hired Plaintiffs</u>.  Sandoval testified that she interviewed only with

2  "Guadalupe"[3] (McRee Decl. Ex. A (Tr. of Dep. of Plaintiff Ernestina Sandoval, February 5, 2015

3  ("Sandoval Dep.")) 48:4-7) – who she stated worked as a supervisor for the Smith family

4  (Sandoval Dep. 45:24-46:10) – and "Guadalupe" hired her during her interview, without

5  consulting with anyone else before making the decision (Sandoval Dep. 45:24-47:24).  Hedgepeth

6  testified that she was hired by Michael Smith after he interviewed her in the Richmond restaurant.

7  (McRee Decl. Ex. C (Tr. of Dep. of Plaintiff Jasmine Hedgepeth, March 10, 2015 ("Hedgepeth

8  Dep.")) 39:21-40:9.)  Ochoa testified that "Lupe" interviewed her and hired her to work at the

9  Smith restaurant on San Pablo Avenue.  (McRee Decl. Ex. D (Tr. of Dep. of Plaintiff Stephanie

10  Ochoa, March 16, 2015 ("Ochoa Dep.")) 57:9-58:16.)  Rodriguez said that she was hired at the

11  Richmond location after her mother, also a Smith employee, informed the restaurant general

12  manager she was interested in a job.  (McRee Decl. Ex. B (Tr. of Dep. of Plaintiff Yadira

13  Rodriguez, March 6, 2015 ("Rodriguez Dep.")) 35:16-36:3.)  She never filled out an application,

14  and never interviewed for the job before being hired.  (*Id.* 36:8-12.)

15           <u>Smith trained Plaintiffs at the restaurants where it assigned them to work</u>.  Sandoval

16  testified that she had no orientation or formal training after she was hired, but learned how to

17  perform her duties on the job, while looking over the shoulder of another recent hire at her

18  restaurant.  (Sandoval Dep. 87:6-12, 99:13-100:12.)  Rodriguez testified that she watched a video

19  on customer service, cleanliness, and uniform policy before she began work at the Richmond

20  restaurant, and that a shift manager showed her how to operate the cash register during her first

21  shift.  (Rodriguez Dep. 38:22-39:13, 40:4-10.)  Hedgepeth claimed that on her first day of

22  employment she watched a "15 second" video on how to operate the cash register, and then

23  received on-the-job training from a fellow crew member.  (Hedgepeth Dep. 110:4-9, 112:23-

24  113:11.)  Ochoa stated that she received on-the-job training on the cash register from one of her

25  coworkers.  (Ochoa Dep. 99:19-23.)  Plaintiffs also confirmed that general managers, shift

26  managers and crew members at the restaurants provided whatever training they received on how

27

28
         [3] While Plaintiffs were unable to provide a last name, when they refer to "Guadalupe" or "Lupe," they are referring to Guadalupe Ortega, the Smith supervisor with operational and employment responsibilities for all five restaurants.  (Ortega Dep. 15:21-16:2; 19:8-24:21.)

1    to clock in and clock out for their shifts.  (Ochoa Dep. 107:9-20; Hedgepeth Dep. 110:14-17.)

2          Smith scheduled Plaintiffs' hours of work, and directed their job assignments.  Rodriguez

3    testified that her shift manager, "Juana," scheduled her hours, and adjusted the schedule to

4    accommodate Rodriguez's request for a 7 a.m. to 3 p.m. shift.  (Rodriguez Dep. 56:13-13, 57:22-

5    58:2.)  Hedgepeth testified that her restaurant general manager scheduled her hours, and stated

6    that when she started to work for a new general manager, that new manager changed her

7    scheduled hours.  (Hedgepeth Dep. 64:16-65:5, 66:7-10.)  Plaintiffs testified that their shift

8    managers determined their job assignment each day (Rodriguez Dep. 41:10-22; Sandoval Dep.

9    48:15-49:8); in particular Hedgepeth and Ochoa testified their shift managers would sometimes

10   assign them to the drive thru window rather than their typical cashier duties (Hedgepeth Dep.

11   43:6-17; Ochoa Dep. 61:25-62:7, 88:25-89:9).  At times Plaintiffs requested special scheduling

12   accommodations, such as time off for illness or an emergency, from their restaurant general

13   manager or a shift manager.  (Ochoa Dep. 88:1-21, 91:10-13; Rodriguez Dep. 58:19-59:16,

14   63:20-64:5; Sandoval Dep. 77:8-16, Hedgepeth Dep. 66:2-6, 66:19-23.)  And the general manager

15   or a shift manager informed them if they had to work late or clock out early.  (Ochoa Dep. 98:15-

16   22; Rodriguez 72:20-25, Sandoval Dep. 81:21-82:15; Hedgepeth Dep. 93:7-11.)

17         Smith's restaurant managers communicated with Plaintiffs about meal periods and rest

18   breaks.  Ochoa stated that, when she began employment, her general manager informed her that

19   she would be provided a 30-minute meal period and 10-minute rest breaks "depending on what

20   hours you're working."  (Ochoa Dep. 111:17-18.)  Rodriguez and Sandoval testified that their

21   general manager or a shift manager would normally tell them when to take breaks (Rodriguez

22   Dep. at 161:1-6; Sandoval Dep. 167:4-3), but occasionally they asked a manager for permission

23   to take a break (Rodriguez Dep. 150:25-151:1).  Hedgepeth testified that her shift manager would

24   tell her when to take breaks, but if no manager was present she would communicate with other

25   crew members on her shift and alternate break times.  (Hedgepeth Dep. 170:16-171:3.)

26         Smith's restaurant managers enforced work rules.  Hedgepeth recalled a time when she

27   was sent home from work by her general manager, "Yadira," for taking two apple pies without

28   paying for them.  She testified that she called "Lupe" to protest this action and "Lupe" told her "if

1   Yadira says you got to go home, you got to go home.  So I clock out and go home." (Hedgepeth

2   Dep. 195:17-196:5.)  Sandoval described receiving a "write-up" from her restaurant assistant

3   manager when she gave incorrect change to a customer.  (Sandoval Dep. 133:9-135:3.)

4           Plaintiffs raised any questions or concerns about their terms and conditions of

5   employment with Smith managers only.  Hedgepeth testified that she called Ed Smith and "Lupe"

6   when she had a complaint about being sent home early by her restaurant general manager.

7   (Hedgepeth Dep. 194:21-195:12.)  Sandoval testified that she complained to her general manager

8   when she was told to wait until the drive-thru cleared to take her rest break during her evening

9   shift.  (Sandoval Dep. 182:10-185:4.)  Plaintiffs also testified that when they had questions or

10  concerns about whether their time was properly recorded or whether they were paid for all time,

11  they raised those with their restaurant general manager or a shift manager.  (Rodriguez Dep.

12  83:15-84:9, 204:24-205:4; Sandoval Dep. 210:4-17; Hedgepeth Dep. 222:16-24.)

13          Plaintiffs never met or spoke with any employee of the McDonald's Defendants regarding

14  the terms and conditions of their employment.  Sandoval could recall only one time in her

15  approximately 21 months working at the Smith restaurant in Richmond that she was aware of

16  someone from "McDonald's corporate" at the store – when someone named "Steve" spoke with

17  her restaurant general manager about signage outside the drive-thru.  (Sandoval Dep. at 40:4-22.)

18  Ochoa, Hedgepeth and Rodriguez testified that they were not aware of ever meeting or speaking

19  with anyone employed by "McDonald's corporate" or from "McDonald's main office."  (Ochoa

20  Dep. 99:10-14; Hedgepeth Dep. 95:20-23; Rodriguez Dep. 76:25-77:4.)

21  **III.   ARGUMENT**

22          Summary judgment shall be granted where the movant shows that there is no genuine

23  dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.

24  R. Civ. P. 56.  Where the non-moving party bears the burden of proof on a claim, the moving

25  party need only point out "that there is an absence of evidence to support the nonmoving party's

26  case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met this

27  burden, the nonmoving party "may not rest upon the mere allegations or denials of the adverse

28  party's pleading," but must provide affidavits or other sources of evidence that "set forth specific

facts showing that there is a genuine issue for trial." *Devereaux v. Abbey*, 263 F.3d 1070, 1076

(9th Cir. 2001) (citations omitted).  If the nonmoving party fails to demonstrate a triable issue "on

an essential element of her case with respect to which she has the burden of proof," the moving

party is entitled to summary judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

### A.   The Undisputed Record Evidence Establishes That the McDonald's Defendants Are Not Plaintiffs' Employer or Joint Employer.

It is well settled in California that "no generally applicable rule of law imposes on anyone

other than an *employer* a duty to pay wages."  *Martinez v. Combs*, 49 Cal. 4th 35, 49 (2010)

(emphasis in original).  Thus, under the California Labor Code, the determination of whether a

defendant is a plaintiff's employer is a "dispositive issue" that, if decided in the negative,

mandates dismissal of the plaintiff's claims as a matter of law.  *See Singh v. 7-Eleven, Inc.*, No.

C-05-04534-RMW, 2007 WL 715488, at *6 (N.D. Cal. Mar. 8, 2007) (dismissing Labor Code

claims for missed meal periods and rest breaks against franchisor that was found not to be

plaintiffs' employer); *Jones v. Cnty. of L.A.*, 99 Cal. App. 4th 1039, 1045-46 (2002) ("The

question before this court is whether [defendant] is plaintiff's employer").

The California Supreme Court has held that Industrial Wage Commission Wage Orders

determine who is an employer under the Labor Code.  *Martinez*, 49 Cal. 4th at 52, 66; *Vann v.

Massage Envy Franchising LLC*, No. 13-cv-2221, 2015 WL 74139, at *6 (S.D. Cal. Jan. 6, 2015)

("In section 1194 actions, California Industrial Welfare Commission Wage Orders define the

employment relationship.") (citing *Martinez*).  IWC Wage Orders define an employer as one

"who directly or indirectly, or through an agent or any other person, employs or exercises control

over the wages, hours, or working conditions of any person."  *Martinez*, 49 Cal. 4th at 64

(adopting the IWC's definition of "employer"); *see also* Wage Order 5 (applying to hospitality

industry).  The term "employ," in turn, is defined as "to engage, suffer, or permit to work."  Wage

Order 5.  In *Martinez*, the California Supreme Court interpreted "employ" to mean: (a) to exercise

control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to

engage, thereby creating an employment relationship.  49 Cal. 4th at 64.

Each of these three interpretations of "employ" analyze similar factors, all of which focus

on the ability to control the terms and conditions of employment.  To "exercise control over the wages, hours or working conditions" means to make decisions regarding hiring, firing, training, supervising, rates of pay, hours worked, and related matters.  *Martinez*, 49 Cal. 4th at 72.  "Suffer or permit to work" was historically intended to reach the situation in which "[a] proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so," *id.* at 69, with "the power to do so" meaning the power to hire and fire, set wages and hours, and tell the workers where and when to report to work, *id.* at 70-71.  And the common law test of an employment relationship is whether the alleged employer "has the right to control the manner and means of accomplishing the result desired."  *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  Factors considered under common law include whether the putative employer interviewed and hired employees, which entity issued pay statements, and whether supervision and discipline of employees was conducted by the putative employer.  *See, e.g., Braboy v. Staples*, No. C 09-4534 PJH, 2011 U.S. Dist. LEXIS 181116 (N.D. Cal. Feb. 24, 2011).

In the franchise context, the California Supreme Court recently held that a franchisor's liability as either an employer or in an agency relationship with a franchisee "requires that the franchisor exhibit the traditionally understood characteristics of an 'employer' or 'principal;' i.e., it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees."  *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 478 (2014) (citing *Vernon v. State of California*, 116 Cal. App. 4th 114, 124 (2004)).  In *Patterson*, the Supreme Court analyzed a franchisor's vicarious liability for workplace harassment and held that the "imposition and enforcement of a uniform marketing and operational plan cannot *automatically* saddle the franchisor with the responsibility for employees of the franchisee who injure each other on the job."  60 Cal. 4th at 478 (emphasis in original).  Even where the franchisor prescribes standards for product quality, general store operations, and brand image, and "vigorously enforce[s]" those standards, *id.* at 478, the franchisor cannot be held liable as an

1    employer if it does not exercise a "comprehensive and immediate level of day-to-day authority

2    over matters such as hiring, firing, direction, supervision, and discipline of the employee," *id*. at

3    499.  Thus, in *Patterson*, the franchisor was not liable because it did not retain or assume the right

4    to control "the relevant day-to-day operations at its franchised locations."  *Id.* at 503.

5    Most recently, the court in *Vann* granted summary judgment to a massage services

6    franchisor, finding it was not an employer for purposes of wage claims under Labor Code section

7    1194.  2015 WL 74139, at *8.  The court found that, even though the franchisor scripted

8    conversations between franchisee employees and clients, required background checks for

9    massage therapists, distributed an operations manual to franchisees, and enforced workplace

10   policies through regular visits, "there is … no evidence that [the franchisor] controlled

11   employees' work schedules," mandated a uniform pay policy, signed paychecks, or controlled

12   hiring or firing.  *Id.  See also Aleksick v. 7-Eleven, Inc.* 205 Cal. App. 4th 1176, 1190 (2012)

13   (affirming grant of summary judgment in favor of franchisor because the franchisee was

14   "responsible for overall store operations, including hiring and firing employees, setting rates of

15   pay and raises, scheduling work and vacations, and giving performance reviews"); *Juarez v. Jani-*

16   *King of Calif., Inc.*, No. 09-3495-SC, 2012 U.S. Dist. LEXIS 7406, at *12 (N.D. Cal. Jan. 23,

17   2012) (granting summary judgment to franchisor on California Labor Code claims because the

18   franchisee had the discretion to hire, fire, and supervise its employees); *Singh,* 2007 WL 715488,

19   at *7 (granting summary judgment to franchisor on California Labor Code claims, finding

20   "California courts have consistently held that a principal-agency relationship exists only when the

21   franchisor retains complete or substantial control over the daily activities of the franchisee's

22   business") (internal citations omitted).

23   Consistent with these same principals, courts in other jurisdictions have granted summary

24   judgment to McDonald's entities, finding they are not the "employer" of the employees of

25   McDonald's franchisees.[4]  Here too, the Franchise Agreements, deposition testimony from

26   ───────────────────

[4] *See, e.g., Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743 (W.D. Tenn. 2012)
(granting summary judgment to McDonald's USA, LLC); *Dudley v. 4-McCar-T, Inc.*, 2011 U.S.
27   Dist. LEXIS 48076 at *8-10 (W.D. Va. 2011), *aff'd*, 458 Fed. App'x 235 (4th Cir. 2011)
(affirming summary judgment to McDonald's Corporation); *Mosley v. McDonald's Corp.*, No.
05-CV-7290, 2008 WL 1883451 (N.D. Ill. Apr. 25, 2008) (granting summary judgment to
28   McDonald's Corporation).

1   representatives of Smith and McDonald's USA, and admissions from Plaintiffs themselves, all

2   confirm that the McDonald's Defendants have no control whatsoever over hiring, firing, and the

3   terms and conditions of employment at Smith's restaurants.

4       **1.      Smith, and Not the McDonald's Defendants, Interviewed Plaintiffs, and All Employees at Its Franchised Restaurants, and Decided Whether To Hire Them.**

5

6       The Franchise Agreements make clear that Smith, not McDonald's, is solely responsible

7   for operating the restaurants and "employ[ing] adequate personnel so as to operate the Restaurant

8   at its maximum capacity and efficiency." (Fr. Agr. ¶ 12(g).) Michael Smith and Guadalupe

9   Ortega confirmed that they selected the employees to interview, personally interviewed

10  prospective hires, and alone determined who to hire, including each Plaintiff. (Smith Dep. 185:1-

11  22, 187:2-11; Ortega Dep. 19:21-20:4.) Plaintiffs likewise testified that they interviewed with

12  either Michael Smith or Guadalupe Ortega, and were hired by Michael Smith or Guadalupe

13  Ortega. (Sandoval Dep. 45:24-47:24, 48:4-7; Hedgepeth Dep. 39:21-40:9; Ochoa Dep. 57:9-

14  58:16.) Smith's control over hiring is consistent with a determination that the McDonald's

15  Defendants are not joint employers. *See, e.g.*, *Patterson*, 60 Cal. 4th at 501 ("[Franchisee]

16  exercised sole control over selecting the individuals who worked in his store.").

17      **2.      Smith, and Not the McDonald's Defendants, Determined the Compensation For Plaintiffs and All Employees at Its Franchised Restaurants.**

18

19      Both Michael Smith and Guadalupe Ortega testified that they determine each crew

20  member's hourly wage rate, including Plaintiffs' hourly rates of pay. (Smith Dep. 187:12-18;

21  Ortega Dep. 22:21-23:5.) And Plaintiffs all testified that their restaurant managers communicated

22  with them about their hourly wages, including confirming with Plaintiffs and other crew members

23  that raises in their wages were reflected in their paychecks. (Hedgepeth Dep. 242:4-7; Sandoval

24  Dep. 53:16-54:12; Ochoa Dep. 187:14-23; Rodriguez Dep. 55:13-20). Smith's control over

25  wages is consistent with a determination that the McDonald's Defendants are not joint employers.

26  *See, e.g.*, *Juarez*, 2012 U.S. Dist. LEXIS 7406, at *12 (franchisees "determine[d] the amount and

27  manner of their [employees'] pay").

28

3.     **Smith, and Not The McDonald's Defendants, Trained Plaintiffs on How to Perform Their Job Duties.**

Guadalupe Ortega testified that she provides new-hire orientation at all Smith restaurants, and directs the training of new crew members.  (Ortega Dep. 21:4-23.)  Plaintiffs confirmed that they received on-the-job training from shift managers and crew members (Rodriguez Dep. 40:4-10), and stated that they were instructed on time recording procedures by their restaurant general managers, shift managers, and other crew members (Ochoa Dep. 107:9-20; Hedgepeth Dep. 110:14-17).   Smith's control over training is consistent with a determination that the McDonald's Defendants are not joint employers.  *See, e.g.*, *Singh*, 2007 WL 715488, at *4 (noting that franchisee trained its own employees).

4.     **Smith, and Not the McDonald's Defendants, Determined the Work Schedules for Plaintiffs, and All Employees at Its Franchised Restaurants, and Controlled Their Job Assignments Each Day.**

Michael Smith and Guadalupe Ortega testified that that the restaurant general manager at each Smith restaurant sets crew member work schedules.  (Smith Dep. 71:15-19; Ortega Dep. 23:6-10.)  Plaintiffs confirmed that they informed their general managers and shift managers of their schedule preferences and availability (Rodriguez Dep. 56:13-20, 57:22-58:2), requested scheduling accommodations directly from restaurant management (Ochoa Dep. 91:10-13; Hedgepeth Dep. 66:2-67:9), and received daily job assignments from their shift managers (Sandoval Dep. 48:15-49:8).  Smith's control over work schedules and assignments is consistent with a determination that the McDonald's Defendants are not joint employers. *See, e.g.*, *Vann*, 2015 WL 74139, at *8 (noting that "the work schedules were created, managed, and distributed within the particular franchise location").

5.     **Smith, and Not the McDonald's Defendants, Was Responsible For Ensuring Plaintiffs and All Employees at Its Franchised Restaurants Correctly Recorded Their Time.**

Michael Smith and Guadalupe Ortega testified that only Ortega or restaurant general managers could edit or correct time entries when crew members failed to properly record time, including when failing to clock in or clock out.  (Smith Dep. 96:14-18, 190:16-20; Ortega Dep. 90:3-92:15.)  Plaintiffs confirmed this, and stated that if they wanted to correct mistakes

1   recording their time, they informed only their managers of the need for corrections.  (Sandoval

2   Dep. 112:20-113:23, 117:3-22; Ochoa Dep. 123:15-21.)  Smith's control over time records is

3   consistent with a determination that the McDonald's Defendants are not joint employers.  *See,*

4   *e.g.*, *Vann*, 2015 WL 74139, at *7 (franchisee set pay and time recording policies).

**6.      Smith, and Not the McDonald's Defendants, Enforced Meal Period and Rest Break Policies at Its Franchised Restaurants.**

5
6
7       Michael Smith and Guadalupe Ortega testified that restaurant general managers and shift

8   managers had authority to organize and track meal periods and rest breaks.  (Smith Dep. 55:7-12;

9   Ortega Dep. 95:16-97:17.)  And Plaintiffs confirmed that they either waited to be notified by a

10  Smith manager to take a break (Sandoval Dep. 167:4-19), sought permission from a Smith

11  manager to take a break (Rodriguez Dep. 150:25-151:1), or coordinated their break time with

12  other crew members (Hedgepeth Dep. 170:16-171:3).  Smith's control over meal periods and rest

13  breaks is consistent with a determination that the McDonald's Defendants are not joint

14  employers. *See, e.g.*, *Patterson*, 60 Cal. 4th at 502 (noting that franchisee enforced the sexual

15  harassment policy at its restaurant).

**7.      Smith, and Not the McDonald's Defendants, Evaluated the Performance of Employees and Enforced Work Rules.**

16
17      Michael Smith testified that he and Guadalupe Ortega evaluated the work of restaurant

18  employees.  (Smith Dep. 189:8-18.)  Plaintiffs testified that only their restaurant general manager

19  or a shift manager imposed employee discipline.  (Hedgepeth Dep. 195:17-196:5; Sandoval Dep.

20  133:9-135:3.)  Smith's control over performance evaluations and discipline is consistent with a

21  determination that the McDonald's Defendants are not joint employers. *See, e.g.*, *Patterson*, 60

22  Cal. 4th at 502 ("The record shows that [franchisee], not Domino's, wielded [the] significant

23  control [of imposing discipline].").

**8.      Smith, and Not the McDonald's Defendants, Maintained a Payroll Bank Account in California for the Payment of Wages to Plaintiffs and All Its Employees.**

24
25
26      The McDonald's Defendants do not have access to, nor are they a signatory to, Smith's

27  bank account, and they have never been listed as an employer on Smith's paychecks.  (Smith

28  Dep. 109:16-18, 190:21-191:1.)  The McDonald's Defendants do not participate in any way in the

1   administration of payroll, timekeeping, recordkeeping, corrections to time records, or payment of

2   wages.  (*Id.* 190:16-20.)  In particular, with regard to the allegations Plaintiffs make in their

3   motion for class certification that they were underpaid because their time data recorded in

4   "hour:minute" format was read as if recorded in an "hour.hundredths of an hour" format (Dkt.

5   No. 70, at 5, 13-14), Plaintiffs' own allegations make clear that McDonald's had nothing to do

6   with any errors made while transmitting data to the Smith payroll vendor's system.  Indeed, the

7   record evidence is clear that the McDonald's Defendants have never had any involvement in

8   transmitting Smith's time data into the system, nor did they have any involvement with the way

9   that information was used by Smith's payroll service provider to pay crew members.  (Smith Dep.

10   109:16-18, 190:16:191:1.)  Smith's control over payroll is consistent with a determination that the

11   McDonald's Defendants are not joint employers.  *See, e.g.*, *Singh*, 2007 WL 715488, at *6 ("The

12   court finds that 7-Eleven was not responsible for . . . using its funds to pay plaintiffs.").

13       In short, it is undisputed that the McDonald's Defendants did not control the terms and

14   conditions of Plaintiffs' employment in any way, and the fact that Smith may be utilizing optional

15   systems, resources, and technology (discussed in Section III.C, *infra*) does not change that fact,

16   much less establish a "comprehensive and immediate level of day-to-day authority over matters

17   such as hiring, firing, direction, supervision, and discipline" of employees.  *See Patterson*, 60 Cal.

18   4th at 499.  Thus, "there is no basis on which to find a triable genuine issue of fact that an

19   employment or agency relationship existed" among the McDonald's Defendants and Smith and

20   its employees.  *Id.* at 563 ("No reasonable inference can be drawn that Domino's through

21   [franchisee], retained or assumed the traditional right of general control an 'employer' or

22   'principal' has over factors such as hiring, direction, supervision, discipline, discharge, and

23   relevant day-to-day aspects of the workplace behavior of the franchisee's employees.").

24       **B.    The Undisputed Record Evidence Establishes That Smith Is Not an Agent of
            the McDonald's Defendants.**

25

26       In addition to their joint employer allegations, Plaintiffs also allege that the McDonald's

27   Defendants are vicariously liable for the employment decisions of Smith because Smith was their

28   agent with respect to the violations alleged in the Complaint.  In *Patterson*, the California

Supreme Court considered joint employment and agency allegations together, applying a single "degree of control" analysis to determine whether the franchisor could be held vicariously liable for the acts or omissions of its franchisee.  60 Cal. 4th at 500-04.  This is consistent with long-established California precedent finding that a principal-agency relationship exists only when the franchisor retains "complete or substantial control" over the daily activities of the franchisee's business.  *See, e.g., Cislaw v. Southland Corp.*, 4 Cal. App. 4th 1284, 1288 (1992) (citing 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 6, pp. 24-25); *Braboy*, 2011 U.S. Dist. LEXIS 18116, at *3 (granting summary judgment to Staples, Inc., finding "the evidence of the actual substantive relationship between the parties indicates that with respect to the hiring, and day to day supervision and control over plaintiff's working environment and job duties, it was [a separate Staples entity's] employees and supervisors who were responsible").  Because, as discussed above, the McDonald's Defendants did not have control over any aspect of Smith's relationship with its employees – and because the Franchise Agreements run for 20-year terms and expressly disavow any agency relationship – they also cannot be in an agency relationship with Smith under the "complete or substantial" control test.

Moreover, to the extent Plaintiffs allege that the McDonald's Defendants exercise indirect control over Smith's operations by acting jointly or in conjunction with Smith to "reduce labor costs in the Restaurants … by maintaining, encouraging, and approving policies and practices that have the purpose and effect of depriving Plaintiffs and Class Members of their full and timely wages when due" (FAC ¶ 29), their argument lacks evidentiary support sufficient to raise a genuine issue of material fact.

The McDonald's Defendants do not directly or indirectly discourage Smith from paying full wages to crew members.  (Steinhilper Decl. ¶ 11.)  Nor do they benefit from labor cost savings at the restaurants operated by its franchisees – none of the payments or fees Smith pays to McDonald's USA pursuant to its Franchise Agreements are impacted by labor costs.  (*Id.*)  This fact cannot be disputed.

1 █████████████████████████████████████████████

2 ████████████████. (Fr. Agr. ¶ 7; FDD at 11-18.) ██████████████

3 █████████████████████████████████████████

4 ███████████████████████████████████████

5 ████████████████████████████ (Fr. Agr. ¶¶ 7-8; Steinhilper Dep. 83:9-25.)

6 Finally, the cost of fixtures, signs, equipment, food, paper, and other supplies necessary for

7 restaurant operation are not impacted by labor costs.  (FDD at 11-18.)

8          The very point of the franchise relationships at issue here, and franchising generally, is to

9 "raise capital and grow [the franchisor's] business, while shifting the burden of running the local

10 stores to the franchisee" *Patterson*, 60 Cal. 4th at 490, because the franchisee is "willing to invest

11 [its] time and money, and assume the risk of loss, in order to profit from its own business, *id*.

12 (citations omitted).  McDonald's Corp. could – and does, through affiliated entities – operate

13 some restaurants itself and "reap[] the full benefits (e.g., maximizing profits) and bear[] the full

14 burden (e.g., investing capital and risking liability) of running a business."  *Id*. at 488.  But having

15 decided to pass the benefit of operating the restaurants involved in this case to Smith, it would

16 defeat the very purpose of the franchise business model to then assume the risk of managing

17 franchisee labor costs especially at the day-to-day or hour-to-hour level Plaintiffs allege in their

18 Complaint.  (*See e.g.*, FAC ¶¶ 28-29, 44-45, 56.)

19          Thus, whether the Court considers the McDonald's Defendants' degree of control over

20 Plaintiffs' terms and conditions of employment directly through control of decisions like hiring,

21 firing, wages and payroll, or indirectly based on Plaintiffs' allegations of control over labor costs,

22 the McDonald's Defendants are not vicariously liable for the actions of Smith or its managers.

23          **C.      The Operational Requirements of McDonald's USA, and the Resources It
24                    Makes Available, Do Not Create an Employment or Principal-Agent
                      Relationship.**

25          Despite the undisputed evidence that only Smith, and not the McDonald's Defendants, has

26 control over the terms and conditions of Plaintiffs' employment, Plaintiffs assert in their

27 Complaint that the operational requirements and the various resources McDonald's USA makes

28 available to Smith are sufficient to create a joint employer or agency relationship.  However,

1    those requirements and resources are meant to protect the McDonald's Defendants' legitimate

2    interest in the McDonald's brand, which California courts have found "allows it to exercise

3    certain controls over the enterprise without running the risk of transforming the independent

4    contractor franchisee into an agent." *Cislaw*, 4 Cal. App. 4th at 1292.

5            Specifically, in *Patterson*, the Court held that making recommendations on pricing and

6    staffing levels, training franchisees when their doors first opened and when a new product was

7    launched, providing an orientation program and an employee handbook for new hires, conducting

8    regular store inspections, and making recommendations about discipline and terminations did not

9    create an employment or agency relationship. 60 Cal. 4th at 503.  In *Vann*, requirements that the

10   franchisee use a specific computer system and software for accounting and point of sale

11   information, conduct pre-hire background checks, and maintain standard business hours, as well

12   as the use of "regional developers to recruit potential franchisees and assist in opening new

13   franchises," did not create an employment or agency relationship.  2015 WL 74139, at *2.  And,

14   in *Field v. Am. Morg. Exp. Corp.*, 2011 U.S. Dist. LEXIS 84601 (N.D. Cal. Aug. 2, 2011),

15   providing a human resources director to give guidance and "opinions" on employment matters,

16   including advice on "hiring, supervision, training, appraisal, discipline and termination," did not

17   create an employment relationship.  2011 U.S. Dist. LEXIS 84601, at *16, 19.  *See also Juarez v.*

18   *Jani-King*, 2012 U.S. Dist. LEXIS 7406 (N.D. Cal. Jan. 23, 2012) (finding controls such as

19   billing and accounting, the right to terminate a franchise's right to service a particular client, and

20   direct communication with the franchisee's clients to address complaints and ensure customer

21   satisfaction did not create a joint employment relationship).

22           Here, as in *Patterson*, *Vann*, and *Field*, the operational systems, resources, standards, and

23   business analytical data McDonald's USA provides to Smith do not create a joint employment or

24   agency relationship with Smith.  While the Franchise Agreements ████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████              (Lewis Dep. 79:7-9; Smith Dep.

1   193:4-15.) ██████████████████████████████████████████

2   █████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████████

4   ████ (Ortega Dep. 131:25-132:8, 136:21-137:2.)

5           McDonald's USA makes available to Smith "Hiring to Win," a hiring resource developed

6   and provided by Aon Corporation, and the Regional Restaurant Data Diagnostics system (R2D2).

7   But, like the putative employers in *Patterson* and *Field*, Smith at all times retains complete

8   discretion to hire or reject any applicant it chooses, regardless of the results of the "Hiring to

9   Win" assessment – indeed, Smith retains discretion as to whether it even subscribes to the service

10  – and in fact has hired applicants who have been designated as "red flags" by Aon.  (Smith Dep.

11  185:1-186:1; 196:11-18.) ██████████████████████████████

12  ██████████████████████████████████████████████████ (Lewis

13  Dep. 199:2-5; 233:6-23.)  McDonald's USA also provides Smith with its Operations and Training

14  Manual.  (Steinhilper Dep. 46:8-17; Smith Dep. 29:25-30:6, 163:23-164:3; Smith Dep. Ex. 45.)

15  But that manual expressly provides that policies related to personnel practices, crew management

16  and scheduling, and training are completely optional for franchisees:

17          • People Practices: "Franchisees are independent employers who make their own
              decisions and policies regarding employment-related matters pertaining to their
18            employees.  Franchisees may choose to use part, all, or none of the contents in
              these materials that will be helpful to them in operating their own McDonald's
19            restaurants. . ."  (Smith Dep. Ex. 45 at 6.)

20          • Training: "Franchisees are independent employers and are solely responsible for
              hiring, assigning roles and responsibilities to, training, and advancing their
21            employees.  Franchisees should establish their own policies and may choose the
              information from this chapter that will be helpful to them in operating their
22            business."  (Steinhilper Decl. Ex. A.)

23          • Crew Management and Scheduling: "Subsidiaries, affiliates, and licensees
              establish their own human resources policies and may choose the information from
24            this chapter that will be helpful to them in operating their businesses."  (Steinhilper
              Decl. Ex. B.)
25
    With the exception of product training and the requirement that each restaurant have at least one
26
    manager trained at Hamburger University, all training and electronic learning McDonald's USA
27
    provides to Smith or its employees, while encouraged, may be declined.  (Fr. Agr. ¶ 6; Steinhilper
28

1    Decl. ¶ 10.)  To the extent any of this training touches on employment practices, McDonald's

2    USA makes clear that "Owner/Operators make their own policies on employment related matters,

3    including wage and hour matters."  (Steinhilper Decl. Ex. C.)

4         Moreover, the use of Consultants by McDonald's USA to ensure the protection of the

5    trademarks and brand does not create an employment or agency relationship.  *See Patterson*, 60

6    Cal. 4th at 485-86, 503; *Vann*, 2015 WL 74139, at *7-8.  Plaintiffs have produced no evidence

7    that Consultants gave them direction to do anything – job related or otherwise – or that

8    Consultants directed Plaintiffs' managers to take particular actions with respect to day-to-day

9    employment issues at the restaurants.  To the contrary, Plaintiffs confirmed that they never

10   interacted with McDonald's Consultants.  (Hedgepeth Dep. 241:11-24; Sandoval Dep. 39:2-9;

11   181:6-11; Ochoa Dep. 43:7-44:17, 225:22-226:6; Rodriguez Dep. 25:21-26:7.)  Finally, the form

12   that Consultants use to conduct Full Operations Reviews (FOR) of franchisees' restaurants

13   expressly reminds them that they cannot dictate personnel policies, or even advise on individual

14   employment matters, and in any event Smith is free to reject any advice from the Consultants:

15        The purpose [of the People Review questions of the FOR] is not to tell the Owner
          Operator how to manage their employees or run their business. Instead it is to offer a
16        tool to assist the Owner Operator…. You must always remember that any decision
          to change people policies or practices rests solely in an owner operated restaurant
17        with the independent Owner Operator…. [T]he Consultant should never render
          advice concerning individual personnel matters…. [T]he Owner Operator is
18        responsible for handling their own individual employment issues.

19   (Steinhilper Dep. Ex. 113 at 54, Smith Dep. 193:15-194:10.)

20        The resources and standards Plaintiffs allege "integrate" the McDonald's Defendants and

21   Smith do not amount to the "comprehensive and immediate level of day-to-day authority" over

22   Smith's operations required to establish vicarious liability.  *Patterson*, 60 Cal. 4th at 499.

23   Instead, these requirements and resources are exactly the types of systems and resources

24   California courts have found consistent with brand protection – and insufficient to establish the

25   franchisor's control over terms and conditions of employment.  *See, e.g., Vann*, 2015 WL 74139,

26   at *7-8 (use of franchisor's operations manuals and software, and visits from business

27   consultants, found insufficient to create an employment or agency relationship); *Patterson*, 60

28   Cal. 4th at 484 (various provisions in franchise agreement on reports and audits, computer and

1    data access, and visits from franchisor's inspectors, found insufficient to create employment or

2    agency relationship).  As the court in *Vann* noted, "[e]nsuring that a client can receive the same

3    type of experience in California as she does in Texas is a necessary concern of franchisors," and

4    does not create an employment or agency relationship.  *Vann*, 2015 WL 74139, at *8; *Patterson*,

5    60 Cal. 4th at 485 (noting that "systemwide standards and controls provide a means of protecting

6    the trademarked brand at great distances").[5]

            **D.**    **Plaintiffs Cannot as a Matter of Law Sustain Their Claims of Negligence, Conspiracy, and Aiding and Abetting.**

        Every substantive paragraph of the negligence count in Plaintiffs' Complaint alleges and

relies upon the McDonald's Defendants' purported "control" over Smith's business operations

(FAC ¶¶ 222-24); thus, for the same reasons Plaintiffs cannot show the McDonald's Defendants

"controlled" Smith for purposes of vicarious liability as a joint employer or principal, they cannot

establish the McDonald's Defendants breached any duty of care owed to Plaintiffs which

proximately caused any alleged injury.  *See Courtland v. GCEP-Surprise, LLC*, No. 12-cv-349,

2013 WL 3894981 (D. Ariz. July 29, 2013) (franchisor not vicariously liable for franchisee's

allegedly negligent conduct).  Moreover, Plaintiffs cannot point to any decision under California

law where a court found negligence in circumstances even resembling the facts here.  At the

hearing on May 13, 2015, Plaintiffs cited *Carillo v. Schneider Logistics, Inc.*, Case No. 11-cv-

8557 (C.D. Cal. May 13, 2013) (McRee Decl. Ex. T) to support their negligence claim.  But

*Carillo* – decided on a motion to dismiss, not summary judgment – involved Wal-Mart's

allegedly negligent retention of a contractor to provide warehouse workers to pack and ship

products to its customers.  The contract at issue in *Carillo* – which is very different than the

Franchise Agreements here – provided Wal-Mart with direct supervision and control over

productivity, labor and cost budgets, staffing and hours worked.  *Id.* at 1-3.  As discussed in

Section III.C, *supra*, the McDonald's Defendants have no such control over Smith's employees.

---

        [5] Because Plaintiffs cannot prove their Labor Code claims against the McDonald's Defendants, their PAGA claims (FAC ¶¶ 226-36) and Business & Professions Code claims (*id.* ¶¶ 237-40) must also fail.  *See* Cal. Labor Code § 2699 (employment relationship required to recover PAGA penalties); *Aleksick*, 205 Cal. App. 4th at 1191-93 (UCL claims failed where franchisor was not plaintiff's employer).

1  *Carillo* also included allegations that Wal-Mart was aware of a long history of labor violations by

2  its contractor that were deemed sufficient, when viewed in the light most favorable to the

3  plaintiff, to survive a motion to dismiss.  *Id.* at 13.  Here, there is no evidence of a history of labor

4  violations by Smith, much less that the McDonald's Defendants had knowledge of any violations,

5  either before or during the terms of McDonald's USA's Franchise Agreements with Smith.

6        As for their remaining allegations, Plaintiffs assert that even if the McDonald's

7  Defendants are not joint employers, they either conspired with or aided and abetted Smith in

8  violating the Labor Code and committing derivative violations.  Conspiracy requires that

9  Plaintiffs prove a conspiratorial agreement or act to violate the law, *Dufour v. Be LLC*, 2010 WL

10  431972, at *9 (N.D. Cal. Feb. 2, 2010), and aiding and abetting requires "substantial assistance or

11  encouragement" of another's tort, *Chetal v. American Home Mortg.*, 2009 WL 2612312, at *4

12  (N.D. Cal. Aug. 24, 2009).  The undisputed record shows Plaintiffs cannot meet this burden.  The

13  only agreement or acts they allege in support of these allegations are that the McDonald's

14  Defendants "conspired" to reduce labor costs – which does not violate the law – or pressured

15  Smith to meet high productivity standards and pay high franchise fees, while maintaining low

16  labor costs – which also does not violate the law.  (FAC ¶¶ 132, 135, 239.)  These allegations also

17  fail for the additional reasons discussed above with respect to Plaintiffs' joint employer and

18  agency claims – the McDonald's Defendants do not discourage Smith from paying full wages to

19  crew members, and they do not benefit from labor costs savings at Smith franchise restaurants.

20      **E.**    **McDonald's of California and McDonald's Corp. Play No Role in Smith's Operations.**

21        In addition to all the reasons discussed above with respect to McDonald's USA,

22  McDonald's of California and McDonald's Corp. are entitled to summary judgment for the

23  separate and independent reason that they have no contractual or other direct relationship with

24  Smith.  *See, e.g.*, *Perez v. State Farm Mut. Auto. Ins. Co.*, No. 06-cv-01962, 2011 WL 5833636

25  (N.D. Cal. Nov. 15, 2011) (dismissing plaintiffs' claims because they had no relationship with

26  affiliate entity defendants).  McDonald's USA, McDonald's Corp., and McDonald's of California

27  are each separate business entities that have their own boards of directors and officers.  (McRee

28

1   Decl. Ex. R (McDonald's USA's Response to Interrogatories, Set One ("Interrog. Resp.")) No.

2   1.)  Neither McDonald's of California nor McDonald's Corp. is a party to Smith's Franchise

3   Agreements, which create a relationship only between McDonald's USA and Edward and Valerie

4   Smith.  (Fr. Agr.; Steinhilper Decl. ¶ 4; Interrog. Resp. No. 2.)

5       It is undisputed that McDonald's of California owns and operates the corporate-owned

6   restaurants in the state of California.  (Steinhilper Dep. 23:2-7; 53:20-23.)  McDonald's of

7   California has no business dealings with franchises, no responsibilities to Smith, and does not

8   receive any payments or fees from Smith.  (Interrog. Resp. No. 2; Steinhilper Decl. ¶ 4.)

9   Plaintiffs have not, and cannot, point to any evidence of any relationship between McDonald's of

10  California and Smith, or the Plaintiffs and other employees of Smith.

11      It is also undisputed that, since May 1, 2005, McDonald's Corp. has not been the

12  franchisor of any McDonald's restaurants in the U.S., and does not have any direct relationship

13  with franchised entities in the U.S.  (Interrog. Resp. No. 1; Steinhilper Decl. ¶ 4.)  McDonald's

14  Corp.'s only relationship with Smith – which is indirect – is as the fee owner of part or all of the

15  real estate located at 4514 Telegraph Avenue, 6623 San Pablo Avenue, 1330 Jackson Street, and

16  2301 MacDonald Avenue, and as the primary lessee of the real estate at 800 Market Street.

17  (Interrog. Resp. No. 2; Steinhilper Decl. ¶ 5.)  McDonald's USA leases these locations from

18  McDonald's Corp. and subleases them to Smith.  (Interrog. Resp. No. 2; Steinhilper Decl. ¶ 5.)

19  McDonald's Corp. has no responsibilities to Smith, and does not receive any payments or fees

20  from Smith.  (Interrog Resp. No. 2; Steinhilper Decl. ¶ 5.)  And Plaintiffs have not, and cannot,

21  point to any evidence linking McDonald's Corp. to any of their claims in this case.

22      Thus, neither McDonald's of California nor McDonald's Corp. is a proper party in this

23  case, and the claims against them should be dismissed for this reason as well.

24  **IV.     CONCLUSION**

25      For the reasons explained above, no genuine issue of material fact exists as to the joint

26  employer, agency, and other bases for liability against the McDonalds Defendants, and

27  accordingly they are entitled to judgment as a matter of law as to all claims asserted against them.

28

1    Dated: May 20, 2015                              Respectfully submitted,

2                                                     JONES DAY

3

4                                                     By:   _/s/ Elizabeth B. McRee_
                                                           Elizabeth B. McRee
5
                                                     Counsel for Defendants
6                                                    MCDONALD'S CORPORATION
                                                     MCDONALD'S USA, LLC
7                                                    MCDONALD'S RESTAURANTS OF
                                                     CALIFORNIA, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28