# Exhibit E

**In the Matter of:**

STEPHANIE OCHOA

vs.

MCDONALD'S CORP.

*SMITH, MICHAEL*

*March 19, 2015*



Phone: 855.348.4997
Fax:   855.299.6722
Email: info@firstlegaldeposition.com
www.firstlegaldeposition.com

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO


STEPHANIE OCHOA, ERNESTINA SANDOVAL,       )
YADIRA RODRIGUEZ, and JASMINE HEDGEPETH,)
on behalf of themselves and others          )
similarly situated,                          )
                                             )
                    Plaintiffs,              )
                                             ) Case No.
vs.                                          ) 3:14-CV-02098-JD
                                             )
MCDONALD'S CORP., a corporation,             )
MCDONALD'S U.S.A., LLC, a limited            )
liability company, MCDONALD'S               )
RESTAURANTS OF CALIFORNIA, INC., a          )
corporation, THE EDWARD J. SMITH and        )
VALERIE S. SMITH FAMILY, LTD.               )
PARTNERSHIP d/b/a MCDONALD'S, a limited )
partnership, and DOES 1 through 100,        )
inclusive,                                   )
                                             )
                    Defendants.              )
_____)




DEPOSITION OF MICHAEL W. SMITH

THURSDAY, MARCH 19, 2015

SAN FRANCISCO, CALIFORNIA




Reported by Sandra S. Petritsch, CSR No. 11684

MICHAEL SMITH

March 19, 2015

```
 1              IN THE UNITED STATES DISTRICT COURT

 2        NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

 3

 4   STEPHANIE OCHOA, ERNESTINA SANDOVAL,    )
     YADIRA RODRIGUEZ, and JASMINE HEDGEPETH )
 5   on behalf of themselves and others      )
     similarly situated,                     )
 6                                           )
                     Plaintiffs,             )
 7                                           ) Case No.
     vs.                                     ) 3:14-CV-02098-JD
 8                                           )
     MCDONALD'S CORP., a corporation,        )
 9   MCDONALD'S U.S.A., LLC, a limited       )
     liability company, MCDONALD'S          )
10   RESTAURANTS OF CALIFORNIA, INC., a      )
     corporation, THE EDWARD J. SMITH and    )
11   VALERIE S. SMITH FAMILY, LTD.           )
     PARTNERSHIP d/b/a MCDONALD'S, a limited )
12   partnership, and DOES 1 through 100,    )
     inclusive,                              )
13                                           )
                     Defendants.             )
14                                           )
     _____)
15

16

17

18

19

20

21           DEPOSITION OF MICHAEL W. SMITH, taken at

22   177 Post Street, Suite 300, San Francisco, California, on

23   Thursday, March 19, 2015, at 11:53 a.m. before Sandra S.

24   Petritsch, Certified Shorthand Reporter, in and for the

25   State of California.
```

MICHAEL SMITH

```
 1    APPEARANCES:

 2

 3        For Plaintiffs:

 4                    ALTSHULER BERZON, LLP
                      BY:  BARBARA J. CHISHOLM, ESQ.
 5                        ABBY SHAFORTH, ESQ.
                      177 Post Street, Suite 300
 6                    San Francisco, California  94108
                      (415) 421-7151
 7                    (415) 362-8064 Fax
                      bchisholm@altber.com
 8

 9        For Defendant Smith Family Limited Partnership:

10                    FREEMAN, MATHIS & GRAY, LLP
                      BY: JOHN L. FITZGERALD, ESQ.
11                    Three Embarcadero Center, Eighth Floor
                      San Francisco, California  94111-4024
12                    (415) 689-1209
                      (415) 689-1209 Fax
13                    jfitzgerald@fmglaw.com

14

15        For Defendants McDonald's Corp., McDonald's U.S.A.,
          and McDonald's Restaurants of California:
16
                      JONES DAY
17                    BY:  LAWRENCE C. DiNARDO, ESQ.
                      77 West Wacker
18                    Chicago, Illinois  60601-1692
                      (312) 782-3939
19                    (312) 782-8585
                      LCDINARDO@JONESDAY.COM
20

21        For Defendants McDonald's Corp., McDonald's U.S.A.,
          and McDonald's Restaurants of California:
22
                      McDONALD'S CORPORATION
23                    BY:  SAVAN N. VAGHANI, Counsel
                      2915 Jorie Boulevard
24                    Oak Brook, Illinois  60523
                      (630) 623-3341
25                    (630) 623- 7370
                      savan.vaghani@us.mcd.com
```

MICHAEL SMITH

March 19, 2015

```
 1        Q.   What does that mean?

 2        A.   She pays bills.  That's the main thing.  Pays

 3   bills and writes checks.

 4        Q.   Does she have any responsibility for payroll?

 5        A.   She did at one point, yes.

 6        Q.   And when did she stop having responsibility for

 7   payroll?

 8        A.   I would say, maybe, 2012.

 9        Q.   Do you know when in 2012?

10        A.   I don't know the exact day.

11        Q.   And what did she do, in terms of payroll?

12        A.   So she would receive the payroll from all of the

13   stores, and she would key in the hours of employees and

14   then she would send it off to our payroll company.

15        Q.   Are there any other job duties that she

16   currently has other than the payroll and paying bills in

17   the back office?

18        A.   No.

19        Q.   Now, Guadalupe Ortega also works with you; is

20   that correct?

21        A.   Correct.

22        Q.   And what is her position?

23        A.   She's a supervisor.

24        Q.   I've seen, at least, one document that referred

25   to her as an operations supervisor; is that her title?
```

MICHAEL SMITH

1     A.    Correct.

2     Q.    What about accounting for the five restaurants;

3  does your mother handle that?

4     A.    We have an accounting firm.

5     Q.    And who is your accounting firm?

6     A.    Mize Houser.

7           MR. FITZGERALD:  I think it's two words.

8           THE WITNESS:  I think it's probably two words.

9     Q.    (By Ms. Chisholm)  And you mentioned previously

10  that there was a vendor that's with the payroll?

11    A.    Yes.

12    Q.    And who is that vendor?

13    A.    Mize Houser.

14    Q.    And that's the current vendor who handles

15  payroll?

16    A.    Correct.

17    Q.    And did you change vendors at some point

18  recently?

19    A.    Yes.

20    Q.    When was that?

21    A.    Prior to 2012.

22    Q.    And who was the vendor prior to Mize Houser?

23    A.    ABC.

24    Q.    And currently who from the Smith organization is

25  responsible for interacting with Mize Houser?

MICHAEL SMITH

March 19, 2015

```
 1        A.    Lupe Ortega, along with myself.

 2        Q.    And so are you and Lupe responsible for

 3   approving the time and pay information that's sent to the

 4   vendor?

 5        A.    Correct.

 6        Q.    And that's currently.  Correct?

 7        A.    Yes.

 8        Q.    Until around 2012 your mother handled that

 9   job?

10        A.    Yes.

11        Q.    And that's, again, true for all five of the

12   restaurants; is that correct?

13        A.    Correct.

14        Q.    Who tracks family and medical leaves for

15   employees at the five restaurants?

16        A.    We just started a company.  Gabriel Insurance.

17        Q.    And when did you start that?

18        A.    The 1st of February.

19        Q.    And prior to February 1st, who would track those

20   leaves?

21        A.    We did not track the leaves.

22              May I ask a question?  Are you referring to

23   healthcare?

24        Q.    No.  I was referring to family and medical

25   leaves of absence.
```

1      A.   So if someone is pregnant, for example, who

2  tracks that?

3      Q.   Yes.

4      A.   That would be Lupe.  The employee would stay in

5  contact with Lupe.  I'm sorry, I misunderstood your

6  question.

7      Q.   Thank you for clarifying.  So if you could turn

8  back to the document that I marked as 44, which is the

9  declaration from your father.  The one that you have in

10 front of you.  On Paragraph 13, it states that the

11 restaurants are open seven days a week, three are open 24

12 hours a day, and two are open from 5 a.m. to 1 a.m.; is

13 that accurate?

14     A.   No.

15          MR. FITZGERALD:  It's vague as to time.

16          Go ahead.

17     Q.   (By Ms. Chisholm)  Can you tell me currently

18 what the hours of operations are?

19     A.   I do have three are 24 hours a day and then one

20 is five days a week and Fridays and Saturdays it is 24

21 hours and one store is open from 5 a.m. to 1.

22     Q.   And it is the San Pablo store that's open for 24

23 hours on Fridays and Saturdays?

24     A.   Right.

25     Q.   And what store is open from 5 a.m. to 1 a.m.?

MICHAEL SMITH

1      A.   Jackson Street.

2      Q.   And the remaining three are 24-hour stores?

3      A.   Correct.

4      Q.   And have the times of operation changed at all

5   since March of 2010?

6      A.   No.

7      Q.   So I'm going to ask a series of questions about

8   various practices and policies in your organization that

9   apply to crew members.  And so that there is not confusion

10  as to what I mean by crew members, seeing that there are

11  different names for crew members, there is a crew member

12  and crew trainer and maintenance, I'm going to refer to

13  all of those as crew members; is that all right?

14     A.   That's fine.

15     Q.   Just to be clear, crew members, crew trainers,

16  and maintenance workers are all hourly employees?

17     A.   Correct.

18     Q.   And they're all non-managerial employees; is

19  that right?

20     A.   Correct.

21     Q.   So crew members are supervised by shift managers

22  and general manager of the store; is that right?

23     A.   Correct.

24     Q.   And crew members perform a variety of tasks.

25  Right?

MICHAEL SMITH

March 19, 2015

```
 1      A.   Correct.

 2      Q.   Can you give me an example of some of the tasks

 3  that they perform?

 4      A.   It could be cashiering.  Under that it could be

 5  maintenance, it could be kitchen staff, it could be

 6  drive-thru staff, lobby.

 7      Q.   Thank you.

 8      A.   You're welcome.

 9      Q.   And your organization keeps track of the

10  members' times through an ISP system; is that right?

11      A.   Correct.

12      Q.   And ISP means in-store processor?

13      A.   Correct.

14      Q.   And crew members generally punch in and out

15  through the cash registers; is that right?

16      A.   The POS, yes.

17      Q.   And "POS" stands for point of sale?

18      A.   Correct.

19      Q.   And each cash register is a POS?

20      A.   Correct.

21      Q.   And the crew member enters their employee ID

22  into the cash register; is that right?

23      A.   Correct.

24      Q.   And then the system records those punch in's and

25  punch out's?
```

MICHAEL SMITH

March 19, 2015

1       A.    No.

2       Q.    How are the punch in's and punch out's

3    recorded?

4       A.    They have to put in their ID number and also put

5    in a password.

6       Q.    So after a crew member puts in their ID and a

7    password, then that punch will be recorded?

8       A.    They have to actually push a button that says

9    clock in or clock out, yes.

10      Q.    And is there a different button for time in and

11   time out?

12      A.    Yes.

13      Q.    So if they're punching in, they would punch in

14   their ID number, their password, and a button that is for

15   time in; is that right?

16      A.    I believe so, yes.

17      Q.    And if they punch out, they would put in their

18   ID number, a password, and press the time out?

19      A.    Correct.

20      Q.    And crew members are supposed to punch in at the

21   beginning of their shift.  Right?

22      A.    Correct.

23      Q.    And they're supposed to punch out before taking

24   any rest or meal break?

25      A.    When they do go on their break, yes.

MICHAEL SMITH

1        Q.   But just to be clear, that's for both rest break

2    and for meal period?

3        A.   Correct.

4        Q.   And then crew members are supposed to punch back

5    in at the end of a rest break or meal period?

6        A.   Correct.

7        Q.   Who tells crew members that they are supposed to

8    punch back in before they start working?

9        A.   It's just instinctive.

10       Q.   When the crew members punch in and out for a

11   rest break, is there a different button for rest break, as

12   opposed to a meal break?

13       A.   No.

14       Q.   It's McDonald's policy, isn't it, to have hourly

15   employees punch in and out for meals or rest breaks?

16       A.   It's our policy and not McDonald's.

17            MR. FITZGERALD:  Can I ask a question of my

18   client?

19            MS. CHISHOLM:  Sure.

20            (Discussion off the record.)

21            MS. CHISHOLM:  I'll mark this as 45.

22            (Deposition Exhibit No. 45 was marked for

23   identification.)

24            MS. CHISHOLM:  Back on the record.

25       Q.   (By Ms. Chisholm)  So I'm showing you something

MICHAEL SMITH

1    Q.   And that's a, no, you don't know of anyone who

2  has changed the settings?

3    A.   Correct.

4    Q.   Is there anyone in the Smith organization who

5  would know how the ISP treats -- distinguishes -- between

6  rest periods and meal periods?

7    A.   Not to my knowledge.

8    Q.   Crew members take meal breaks when they're told

9  to do so by a manager; is that correct?

10    A.   Correct.

11    Q.   And it could be a shift manager who tells them

12  to take a break?

13    A.   Correct.

14    Q.   Or the store's general manager?

15    A.   Correct.

16    Q.   Does anyone else have authority to tell a crew

17  member to take a break?

18    A.   No.

19    Q.   And a crew member can't simply take a meal break

20  without checking with the manager; is that right?

21    A.   They can check with a manager, yes.

22    Q.   But without checking with a manager, they can't

23  just go on and take a break?

24    A.   No.

25    Q.   So if a shift manager tells a crew member that

MICHAEL SMITH

```
 1  crew member should take their meal breaks?
 2       A.   Is there documentation?
 3            MR. FITZGERALD:  I object.  It's vague and
 4  ambiguous.
 5       Q.   (By Ms. Chisholm)  Is there any document that
 6  would tell a crew member on a given day, say today, when
 7  during the day they should take their meal break?
 8       A.   We have posting's in the crew room.
 9       Q.   And what's posted in the crew room?
10       A.   There is -- it's, actually, a break policy
11  poster.  What they're able to take.
12       Q.   But there is not a schedule that would say
13  Guadalupe is to take her break at 1 p.m. today?
14       A.   No.
15       Q.   There is not a document that gives specific
16  times for specific crew members to take breaks?
17       A.   No.
18       Q.   And that's also true for rest breaks, as well;
19  is that right?
20       A.   Correct.
21       Q.   I'll show the witness a document that's been
22  previously marked as Exhibit 12.  Mr. Smith, in your
23  previous testimony you said that there is a break policy
24  in the break room; is that right?
25       A.   Correct.
```

MICHAEL SMITH

March 19, 2015

```
 1        Q.   And looking at this document that's marked
 2   Exhibit 12, is this a document to which you're
 3   referring?
 4        A.   Yes.
 5        Q.   And this document is entitled, "McOpCo Rest and
 6   Meal Break Policy"; do you see that?
 7        A.   Yes.
 8        Q.   And what is McOpCo?
 9        A.   It's company owned stores.
10        Q.   The Smith organization is not McOpCo; is that
11   right?
12        A.   Correct.
13        Q.   And this document is posted in one store
14   currently or more than one store?
15        A.   All five.
16        Q.   And when was this document posted?
17        A.   I don't remember.
18        Q.   It was posted fairly recently, wasn't it?
19        A.   Recently meaning what?
20        Q.   It was posted sometime in the summer; is that
21   correct?  This past summer?
22        A.   I don't recall.
23        Q.   Was it posted after the lawsuit was filed?
24        A.   I don't recall.
25        Q.   Do you have any reason to doubt that it was
```

MICHAEL SMITH

```
 1   the five Smith stores?

 2        A.   No.

 3        Q.   Is this a document that, at some point, did

 4   apply in the five Smith stores?

 5        A.   Yes.

 6        Q.   Do you know when it was applicable?

 7        A.   I would say 2009, maybe 2011.

 8        Q.   And when you say that it no longer applies, does

 9   that mean that this is not given to crew members

10   anymore?

11        A.   This document?

12        Q.   This document?

13        A.   Correct.

14        Q.   Was this document ever posted in the Smith

15   stores?

16        A.   Was this document posted?  No.

17             MR. FITZGERALD:  By the way, I think we agreed

18   in deposition that this document, as redacted, we redact

19   the names to keep it confidential.

20             MS. CHISHOLM:  Okay.

21        Q.   (By Ms. Chisholm)  If you could look at

22   Paragraph 4F, which is on the second page.  Do you see

23   where it states, "No 30-minute break between 12 p.m. and

24   1:30 p.m."?

25        A.   Yes.
```

MICHAEL SMITH

1      A.    Yes.

2      Q.    And the Smith organization has saved all of

3    these payroll exception reports.   Right?

4      A.    To my knowledge, yes.

5      Q.    Does anyone other than yourself look at or use

6    these reports?

7      A.    I believe Lupe does.   Lupe Ortega.

8      Q.    And do you know what, if anything, she does with

9    the payroll exception reports?

10      A.    No.

11      Q.    Have you known McDonald's personnel ever to

12    review these reports?

13      A.    No.

14      Q.    Just going back briefly to my questions about

15    meal periods and the shifts to which they entitle

16    employees to meal periods, the Smith organization doesn't

17    have a policy of asking employees to waive their meal

18    periods, does it?

19      A.    No.

20      Q.    If you could turn back to this document, I think

21    it's Exhibit 5.   And if you could look at Paragraph 3B on

22    the first page, it states, "Uniforms must be clean, neat,

23    and worn complete as issued:   One hat, two pants, three

24    shirts, four aprons, and five hair nets."   Do you see

25    that?

MICHAEL SMITH

1    A.   Yes.

2    Q.   Is that the current policy in the Smith

3  restaurants, as well?

4    A.   Except for the pants, everything else is

5  correct.

6    Q.   When you say "except for the pants," the pants

7  still have to be clean and neat?

8    A.   Correct.

9    Q.   You just don't provide the pants?

10    A.   Correct.

11    Q.   And what the Smith organization does provide is

12  a hat, a shirt, and an apron; is that correct?

13    A.   As well as hair nets, yes.

14    Q.   And does the Smith organization require a

15  deposit for the uniforms?

16    A.   No.

17    Q.   And, just quickly, looking at 8D on the third

18  page, D as in dog, this refers to picking up the

19  employees' final check; is it the policy, in the Smith

20  organization still, that employees need to pick up their

21  final check?

22    A.   Yes.

23    Q.   So the organization doesn't mail final checks?

24    A.   No.

25    Q.   So if -- does the Smith organization have a

MICHAEL SMITH

March 19, 2015

1    a document marked Exhibit 47 that, again, looks like it

2    was produced on the store manager's business system; do

3    you see that?

4         A.   Yes.

5         Q.   So this is a document produced through the ISP;

6    is that right?

7         A.   Correct.

8         Q.   And this one is titled, "The Daily Crew Schedule

9    Report"; do you see that?

10        A.   Yes.

11        Q.   Are you familiar with this type of report?

12        A.   I've seen it, yes.

13        Q.   Is this a report that is produced on a regular

14   basis by the ISP for the Smith organization?

15        A.   What's the question one more time?

16        Q.   It's a type of report that's produced on a

17   regular basis at the Smith organization?

18        A.   Yes.

19        Q.   And can you describe briefly what it is?

20        A.   It looks like a crew schedule.  I don't look at

21   them too often, but it's a crew schedule for -- it looks

22   like -- Sunday, 6/10/12.

23        Q.   I'll represent for the record that what we did

24   was print a file as it was produced to us.  And it appears

25   to actually have the schedules for each day during that

MICHAEL SMITH

```
 1      Q.   Does it say Dear Ed and Valerie and Michael?

 2      A.   Yes.  It does say Michael on it, yes.

 3      Q.   And so did you receive a copy from your

 4  parents?

 5      A.   Yes.

 6           MS. CHISHOLM:  So just for the record, the

 7  documents that I've marked as Exhibits 49, 50, 51, 52, and

 8  53 have all been marked highly confidential, but I think

 9  we've established that Mr. Smith had access to them and

10  received copies of them and so we're invoking that under

11  the production order.

12           MR. DiNARDO:  Agreed.

13           MR. FITZGERALD:  Agreed.

14           MR. VAGHANI:  Agreed.

15      Q.   (By Ms. Chisholm)  So turning to the issue of

16  payroll, can you describe -- you can put those aside.  I'm

17  not going to ask you any questions on them.

18           Can you talk me through the process of how the

19  time that is recorded in the ISP is transferred to the

20  payroll vendor?

21      A.   Lupe would know more than I do, but there is a

22  report that you print out.  I'm not sure what the name of

23  the report is.  And it's also pulled through the modem

24  from QsrSoft and from there it's uploaded to Mize

25  Houser.
```

MICHAEL SMITH

March 19, 2015

1        Q.    Are you aware that there are sometimes problems

2    with reporting crew members' punches after the ISP system

3    has been reset?

4        A.    Not to my knowledge, no.

5        Q.    You haven't heard that oftentimes the ISP

6    doesn't know how to recognize a punch as a punch in and

7    punch out after it's been reset?

8        A.    Not to my knowledge, no.

9              MS. CHISHOLM:  Mark this as 56.

10             (Deposition Exhibit No. 56 was marked for

11    identification.)

12        Q.    (By Ms. Chisholm)  So, Mr. Smith, this is

13    another time punch summary report; do you recognize it as

14    a form report from the ISP?

15        A.    Yes.

16        Q.    If you could turn to page 24 of this report and

17    if you look down under the name Ernestina, and you look to

18    April Fool's Day on April 1st of 2014; do you see that?

19        A.    I do.

20        Q.    So that shows -- if I'm reading the shift

21    punches correctly, that shows a shift that started at 2300

22    and 5 minutes or 11:05 p.m., right, and ends at 6:14 a.m.

23    the next day?

24        A.    Yes.

25        Q.    And it appears that that shift is attributed to

MICHAEL SMITH

March 19, 2015

1    April 1st even though it obviously spans two days; do you

2    see that?

3        A.    Yes.

4        Q.    And is that because the ISP records shifts on

5    the day that they start?

6        A.    Yes.

7        Q.    This was previously marked as Exhibit 22.  And

8    do you recognize this document, Exhibit 22, as a form of

9    report that is also generated by the ISP?

10       A.    Yes.

11       Q.    And this is a time punch change approval report;

12   is that right?

13       A.    Correct.

14       Q.    Now, who is authorized to change punch times?

15       A.    It would be the general manager.

16       Q.    Just the general manager or do shift managers

17   also have the authority to change?

18       A.    Just the general manager, as well as Lupe.

19             (Discussion off the record.)

20             MS. CHISHOLM:  I'll clarify that the 22, I

21   think, was probably written by Matt Murray in our office.

22             MR. FITZGERALD:  If you say so, that's good

23   enough for me.

24       Q.    (By Ms. Chisholm)  And what would a general

25   manager do in order to change punch-in time in the ISP; do

MICHAEL SMITH

1      A.    Yes.

2      Q.    And Mize Houser also does that?

3      A.    Yes.

4      Q.    Why did you switch from ABC to Mize Houser?

5      A.    Mize Houser is a big corporation that offers

6  bigger services and is our accounting firm.

7      Q.    Were there any problems with ABC that you're a

8  aware of?

9      A.    No.  They're a great company.

10     Q.    Are you required to use a McDonald's approved

11  vendor for payroll?

12     A.    I believe so, yes.

13     Q.    And so both ABC and Mize Houser were McDonald's

14  approved vendors?

15     A.    I'm not sure about ABC.

16     Q.    But Mize Houser is?

17     A.    I believe so, yes.

18     Q.    So in the period of March of 2010 through around

19  December 15th of 2013, it looks like the Smith

20  organization used bimonthly pay periods.  So you paid

21  twice a month; is that right?

22     A.    Yes.

23     Q.    And after that date all of the restaurants

24  switched to a one week pay period initially and then every

25  two weeks; is that right?

**MICHAEL SMITH**

1          Q.   But if you look at the first entry here, you'll

2     see that the check date is September of 2013?

3          A.   Yes.

4          Q.   And is that, approximately, the time --

5     September of 2013 -- that you switched payroll vendors?

6          A.   Approximately.  Possibly so, yes.

7          Q.   So have you seen reports from your current

8     payroll vendor previously that look like this?

9          A.   No.

10          Q.   So do you have any basis for an understanding of

11     what the various columns mean?

12          A.   I understand what the columns mean, yes.

13          MR. FITZGERALD:  Beyond what you and I also

14     looked at?

15          MS. CHISHOLM:  I'll ask the questions.

16          Q.   (By Ms. Chisholm)  Is your understanding based

17     simply on reading these?  The column names?

18          A.   Correct.

19          Q.   Did you authorize your current payroll vendor to

20     produce payroll information in this case?

21          A.   Yes.

22          Q.   And do you have any reason to doubt that the

23     file that was produced in this case accurately represents

24     your payroll information?

25          A.   You said, do I have any reason to doubt?

MICHAEL SMITH

March 19, 2015

1       Q.   And do you know whether there have been any

2   changes to the format of the check from March of 2010

3   through the present?

4       A.   Has there been any difference in the format?

5   Yes.  Two different companies.

6       Q.   So do you know, looking at this, which vendor

7   this was produced by?

8       A.   No.

9       Q.   And in December of 2012, I guess there is a

10   check dated January of 2013, that would be your current

11   Mize Houser vendor; is that right?

12       A.   I believe so, yes.

13       Q.   This format does not list McDonald's as an

14   employer; is that right?

15       A.   Correct.

16       Q.   And the Smith organization has never listed

17   McDonald's as an employer on the paycheck?

18       A.   Correct.

19       Q.   And it has never listed McDonald's address on

20   any of the checks?

21       A.   Correct.

22       Q.   The paycheck identifies that it appears all

23   regular hours and then has a place for any overtime hours;

24   do you see that?

25       A.   Yes.

REPORTER'S CERTIFICATION

    I, Sandra S. Petritsch, Certified Shorthand Reporter in and for the State of California, do hereby certify:

    That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

    IN WITNESS WHEREOF, I have subscribed my name on this date: _MARCH 25TH_ , 20_15_

Sandra S. Petritsch, CSR No. 11684