UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHANIE OCHOA, et al.,

    Plaintiffs,

v.

MCDONALD'S CORP., et al.,

    Defendants.

Case No. 14-cv-02098-JD

**ORDER RE SUMMARY JUDGMENT**

Re: Dkt. No. 143

This case is a putative class action for labor violations under California state law. Named plaintiffs Stephanie Ochoa, Ernestina Sandoval, Yadira Rodriguez, and Jasmine Hedgepeth have sued defendants The Edward J. Smith and Valerie S. Smith Family Limited Partnership and three McDonald's entities -- McDonald's USA, McDonald's Corporation, and McDonald's California. Edward Smith and Valerie Smith, joined recently by their son Michael Smith, are franchisees of McDonald's USA, and run five restaurants in Oakland and Richmond, California.[1] All three of the McDonald's defendants[2] have moved for summary judgment that they are not joint employers of the plaintiffs and the putative class of current and former employees at the Smith restaurants, and that they are not liable on plaintiffs' negligence claim. Plaintiffs agree that McDonald's California should not be in the case, but oppose the McDonald's motion in all other respects.

The Court grants and denies the motion in part. Even when viewed in the light most favorable to plaintiffs, the record before the Court compels the finding that the McDonald's defendants do not directly employ the plaintiffs or the putative class, and are entitled to summary judgment on that issue. The McDonald's defendants are also entitled to summary judgment

---

[1] The Court refers to the Smiths and their family foundation collectively as "Smith."

[2] Unless otherwise specified, the Court refers to McDonald's USA as "McDonald's."

against plaintiffs on negligence. But material fact disputes preclude summary judgment on the issue of whether the McDonald's defendants are liable as a joint employer under an ostensible agency theory.

**BACKGROUND**

The four named plaintiffs are past and present employees of the Smith restaurants. *See* First Amended Complaint ("FAC") ¶¶ 8-11, Dkt. No. 40. They allege thirteen causes of action, most of which are California Labor Code claims against both Smith and the McDonald's defendants. The second claim for relief -- failure to pay overtime under California Labor Code §§ 510, 1194, 1194.5, and 1198 -- is based on allegations that the In-Store Processor ("ISP") software Smith uses is programmed to assign all hours worked on a shift to the day on which the shift starts, even if it continues into the next day. *See* FAC ¶¶ 160-68; Motion for Class Certification ("Mot. for Class Cert.") at 5:12-6:1, Dkt. No. 100-5. The third claim for relief, for failure to pay minimum wages under California Labor Code §§ 1182.2, 1194, 1194.2, 1194.5, 1197, and 1198, is based on allegations that franchisee Valerie Smith, in the course of manually inputting each employee's hours to send to a third-party vendor for payroll processing, incorrectly converted time reported in the "hour:minute" format to time recorded in an "hour:hundredths of an hour" format. *See* FAC ¶¶ 169-75; Mot. for Class Cert. at 4:18-5:11. The fourth and fifth claims, brought under California Labor Code §§ 226.7, 512, 1194.5, and 1198, allege that the plaintiffs were not provided the meal and rest breaks required by law. *See* FAC ¶¶ 176-91; Mot. for Class Cert. 6:2-9:17. The eighth claim for relief, under California Labor Code §§ 204 and 226, alleges that plaintiffs were given legally inadequate earnings statements. *See* FAC ¶¶ 206-13, Mot. for Class Cert. 10:3-7. The ninth claim for relief, brought under California Labor Code §§221, 450, 1198, 2802, and 1194.5, alleges that plaintiffs were not reimbursed for the time required to maintain their uniforms. *See* FAC ¶¶ 214-20; Mot. for Class Cert. 9:18-10:2.

Plaintiffs also allege negligence against the McDonald's defendants as a tenth claim for relief. *See* FAC ¶¶ 221-25. The basis for the negligence claim is that the McDonald's defendants injured the plaintiffs by "1) setting up the ISP to assign hours to the date the shift started, and failing to inform Smith about this, causing a failure to identify and pay daily overtime; 2) failing

1   to train Smith appropriately on the ISP timekeeping and payroll systems, contributing to the
2   miscalculated wages violations; 3) setting up the ISP to create schedules that do not take into
3   account time needed for legally required rest breaks, pressuring Smith to cut labor costs,
4   programming the ISP to not identify untimely rest breaks as rest break violations (and not
5   notifying Smith), and failing to provide a mechanism in the ISP and payroll systems for the
6   payment of an hour's wages to a crew member who has a missed, late, or short break; 4) requiring
7   crew members to wear clean and neat McDonald's uniforms; and 5) causing Smith not to list
8   McDonald's as an employer on wage statements." Plaintiff's Opposition at 29:18-26, Dkt. No.
9   196-4.

## DISCUSSION

Summary judgment is appropriate when the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are facts that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party for summary judgment bears the initial burden of identifying the portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party will have the burden of proof at trial, however, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56. The Court is concerned only with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the district court to scour the record in search of a

genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  *Id*.  If the nonmoving party fails to make this showing, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Celotex*, 477 U.S. at 323.

The current version of Rule 56 changed the federal summary judgment process by authorizing the Court to grant what is sometimes called partial summary judgment to dispose of less than the entire case and even just portions of a claim or defense.  *See* Fed. R. Civ. P. advisory committee's note, 2010 amendments; *see also Smith v. State of Cal. Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).  Now the Court can, when warranted, selectively fillet a claim or defense without dismissing it entirely.  The current version of Rule 56 also emphasizes that the Court "shall" issue summary judgment when warranted by the facts and the law.  *Id.*

## I. JOINT EMPLOYER LIABILITY

### A. Legal Standard

The McDonald's defendants are potentially liable under plaintiffs' California Labor Code claims only if they employ the plaintiffs and the putative class.  The parties agree that the standards to determine whether the McDonald's defendants are directly liable as joint employers are set out in *Martinez v. Combs*, 49 Cal. 4th 35 (2010), where the California Supreme Court held that the definition of "employer" for minimum wage purposes is provided in the orders of California's Industrial Welfare Commission ("IWC"), rather than common law.[3]  The IWC defines

---

[3] Although *Martinez* involved alleged minimum wage violations under California Labor Code § 1194, California courts have applied the *Martinez* definition of employment to causes of action arising under other sections of the Labor Code as well.  *See, e.g.*, *Sotelo v. MediaNews Group, Inc.*, 143 Cal. Rptr. 3d 293, 310-11 (Cal. Ct. App. 2012) (holding that *Martinez* applied to actions other than section 1194 violations); *Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1430 (Cal. Ct. App. 2010) ("To answer the question whether Payday acted as Futrell's employer for purposes of [sections 203, 226, 510, and 1194 of the California Labor Code], we see no reason to apply any other definition than the *Martinez* definition . . . ."); *see also Taylor v. Waddell & Reed Inc.*, 09-CV-02909 AJB WVG, 2013 WL 435907, at *3 (S.D. Cal. Feb. 1, 2013) (applying the *Martinez* definition of "employment" to causes of action brought under Cal. Lab. Code §§ 201, 202, 203, 204, 218.5, 218.6, 226, 226.7, 2698 *et seq.*, 510, 1182.12, 1194, 1194.2, and 1197, Cal. Bus. & Prof. Code § 17200 *et seq.*, and Wage Order Nos. 4-2001 §§ 3(A), 4(A), and 11(A)); *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 401-02 (N.D. Cal. 2012) (holding *Martinez* generally applies to wage and hour claims).  In light of these cases and the parties' agreement, the Court also applies the *Martinez* standard, but notes that the California Supreme Court has not yet decided the issue.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014)

"employer" as a person who "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." *See Martinez*, 49 Cal. 4th at 59 (quoting Wage Order No. 14). "Employ" is further defined to mean "to engage, suffer, or permit to work." *Id.* at 57 (quoting Wage Order No. 14). Consequently, under *Martinez*, to "employ" means (1) "to exercise control over . . . wages, hours or working conditions," (2) "to suffer or permit to work," or (3) "to engage, thereby creating a common law employment relationship." *Id.* at 64. Any of the three is sufficient to create an employment relationship.

### 1. Exercise Control over Wages, Hours, or Working Conditions

Under the first prong of *Martinez*, an entity employs workers if it "directly or indirectly, or through an agent[4] or any other person, employs or exercises control" over their wages, hours, or working conditions. IWC Wage Order No. 9-2001 § 2(G). While this language is potentially quite broad in scope, California courts have circumscribed it by denying employer liability for entities that may be able to influence the treatment of employees but lack the authority to directly control their wages, hours or conditions.

*Martinez* expresses this limitation. The plaintiffs -- seasonal agricultural workers -- sued a strawberry farmer and two of the produce merchants through whom the farmer sold his fruit. *Martinez*, 49 Cal. 4th at 42. While recognizing that the merchants could leverage their business relationship to influence the farmer, *Martinez* held that they were not joint employers. The fact that a merchant could decide the amount of the advance it paid to the farmer did not make it an employer, even though that could have been used as an indirect way of controlling the farmer's ability to pay his employees. *See id.* at 72. Even more significantly, the fact that a merchant's

---

("[W]e leave for another day the question what application, if any, the wage order tests for employee status might have to wage and hour claims such as these"). The California Supreme Court has recently granted review on the question of how broadly *Martinez* should be applied. *See Dynamex Operations West, Inc. v. Superior Court*, No. S222732, 182 Cal. Rptr. 3d 644 (Jan. 26, 2015).

[4] In addition to the argument that McDonald's directly meets this prong of the *Martinez* test, plaintiffs also assert that Smith is an ostensible agent of McDonald's, an argument addressed in section I.C. below.

field representatives "would explain to [the farmer] and his foreman how the merchant wanted strawberries packed," would "check the packed containers as workers brought them from the field," and "would also sometimes speak directly to the workers, pointing out mistakes in packing such as green and rotten berries" did not establish that the merchant was an employer because there was no evidence that the farmer's employees "viewed the field representatives as their supervisors or believed they owed their obedience to anyone but [the farmer] and his foremen." *Id.* at 76. Only the farmer himself employed the workers, because "he, alone, decided which fields to harvest on any given day and whether to harvest strawberries for fresh market sale or for the freezer" and he "alone, with the assistance of his foremen, hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay (hourly or piece rate), and set their hours, telling them when and where to report to work and when to take breaks." *Id.* at 72.

*Martinez* does not stand alone in this analysis. The California Court of Appeal in *Futrell v. Payday California, Inc.*, also held that "'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay," and that an entity that "does not control the hiring, firing, and day-to-day supervision of workers" is not an employer. 190 Cal. App. 4th 1419, 1432-33 (Cal. Ct. App. 2010).

A focused interpretation of the IWC's "exercise control" test was again applied in *Olmstead v. Home Depot U.S.A., Inc.*, No. B248296, 2015 WL 1791440, at *5 (Cal. Ct. App. Apr. 17, 2015) (depublished).[5] In that case, the plaintiff worked for Cover-All, a company that contracted with Home Depot to install flooring bought by its customers. *Id*. at *1. The plaintiff sued Cover-All and Home Depot as joint employers for labor code claims. The court affirmed summary judgment for Home Depot on the issue. It held that "Home Depot's rights to compel a Cover-All employee to pass a background check, wear a proper badge evidencing that he did, be groomed, and be on time, and to have that employee not assigned to or be removed from a Home

---

[5] Federal courts may consider depublished California state court decisions. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value"); *McSherry v. Block*, 880 F.2d 1049, 1052 n.2 (9th Cir. 1989) ("While the depublication order may constitute a factor as to whether we are bound by the Appellate Department's construction, we do not necessarily find that factor decisive.").

6

Depot job site are not indicia of a joint employer relationship" and that "[t]he retention of some supervision and control does not transform Home Depot into a joint employer," even though Cover-All agreed that "its employees had to pass a background check by a Home Depot agent" and "agreed to comply with Home Depot's rules and regulations and policies of customer service and customer relations." *Id.* at *6. The fact that Home Depot could issue a charge-back to Cover-All -- which resulted in Cover-All docking its employee's pay -- was also not enough to make Home Depot an employer. *See id.* at *7. The court found "that the power of a business owner to supervise and control the work results in furtherance of its entitlement to quality assurance does not transform an independent contractor's employee into an employee of the owner and thus render that owner a joint employer of the employee." *Id.* at *7. Rather, the fact that "Home Depot had no authority to hire, terminate, or supervise Cover-All's employees" was dispositive. *Id.* at *6.

### 2. Suffer or Permit to Work

*Martinez*'s application of the second test for joint employer liability is similarly precise. For that test, the California Supreme Court held that an entity can be liable as an employer for "suffering or permitting to work" only if it "fail[s] to perform the duty of seeing to it that the prohibited condition does not exist." *Martinez*, 49 Cal. 4th at 69 (internal quotation omitted). Put less opaquely, the "basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Id.* at 70 (emphasis in original).

In *Martinez*, the California Supreme Court found that the produce merchants were not employers because "neither had the power to prevent plaintiffs from working." *Id.* Only the strawberry farmer and his foreman "had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work." *Id.* Crucially, *Martinez* noted that the merchants "might as a practical matter have forced [the farmer] to lay off workers or to divert their labor to other projects" by ceasing to buy strawberries from him, but held that "[s]uch a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce." *Id.*

*Futrell* reached the same result. The Court of Appeal held that there "is no evidence ... Payday allowed [the plaintiff] to suffer work, or permitted him to work, because there is no evidence showing Payday had the power to either cause him to work or prevent him from working." *Futrell*, 190 Cal. App. 4th at 1434.

### 3. Engage

*Martinez* held that "to engage" means to create a common law employment relationship. *Martinez*, 49 Cal. 4th at 64. In *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474 (2014), the California Supreme Court elucidated the meaning of the common law definition of employment in the franchisor context. "A franchisor . . . becomes potentially liable for actions of the franchisee's employees, only if it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." *Patterson*, 60 Cal. 4th at 497-98.

The court applied this principle to find that Domino's Pizza, the franchisor, could not be held liable as a joint employer for a sexual harassment claim brought against a franchisee. The court acknowledged that Domino's required training programs for franchisee employees on job duties such as the use of a standardized computer system, pizza-making, store operations, safety and security, and driving, and that it provided job orientation materials. *Id.* at 500. It also noted that the franchisee felt that he always had to say "yes" to Domino's area manager's "suggestions," presumably due to the considerable economic influence Domino's was able to exercise over franchisees. *See id.* at 485. But the court determined that the plaintiff could not sue Domino's as an employer because, among other facts, Domino's had no direct control over "recruiting, hiring, training, scheduling for work, supervising and paying" the franchisee's employees, and Domino's had no right to establish a sexual harassment policy or to impose discipline for violations of it. *Id.* at 500.

### B. Application to McDonald's

#### 1. Exercise Control over Wages, Hours, or Working Conditions

Plaintiffs focus mainly on the argument that McDonald's meets the "exercise control" prong of *Martinez*'s tests. On top of a mountain of materials about the relationship between

McDonald's and Smith, plaintiffs submitted the declaration of Kathryn Slater-Carter, a former franchisee of McDonald's. Ms. Slater-Carter discusses how she believes McDonald's can control franchisees through the power to terminate franchise agreements, decline to renew existing franchise agreements or enter into new ones, and impose technology, personnel, and training requirements on franchise operations. *See, e.g.*, Declaration of Kathryn Slater-Carter ("Slater-Carter Decl.") ¶¶ 10, 13, 20, Dkt. No. 189. Ms. Slater-Carter herself sold her two McDonald's restaurants after McDonald's determined that she would no longer be eligible for "rewrite," that is, for entering into a new agreement after her franchise agreement expired. *See* Slater-Carter Decl. ¶¶ 1, 6, 8.

Plaintiffs have also submitted the declaration of John A. Gordon, a restaurant advisor and consultant. *See* Declaration of John A. Gordon ¶ 2, Dkt. No. 219-3. Mr. Gordon opines that "McDonald's is able to exercise a greater degree of control over its franchisees' restaurants than other franchisors" through control over growth and rewrite, and the ability to terminate franchise agreements for deviation from its standards. *Id.* ¶¶ 10, 25-36. He states that McDonald's terminates franchise agreements far more frequently than its competitors Burger King and Wendy's, *see id.* ¶ 26, and that termination of a franchise agreement is, unsurprisingly, potentially devastating for a franchisee, *see id.* ¶ 29. He also contends that McDonald's pays more attention to its franchisees' balance sheets than most other franchisors. *Id.* ¶¶ 19-22.

The problem plaintiffs face is that the declarations and the welter of other facts they proffer do not establish a triable dispute on the issue of McDonald's direct control. The Court has invested a substantial amount of time reviewing plaintiffs' voluminous submissions. Taking this evidence in the light most favorable to plaintiffs, it is clear that McDonald's has the ability to exert considerable pressure on its franchisees. It can try to influence a franchisee in many ways, up to and including termination of the business relationship. But the evidentiary showings about McDonald's strength as a franchisor do nothing to negate or call into question the dispositive fact that the authority to make hiring, firing, wage, and staffing decisions at the Smith restaurants lies in Smith and its managers -- and in them alone. *See* Deposition of Michael Smith ("M. Smith Dep. Tr.") 185:11-22, 187:2-188:8, 189:19-191:1, Dkt. Nos. 142-6, 199-2; Deposition of

Guadalupe Ortega ("Ortega Dep. Tr.") at 19:21-20:4, 22:21-23:18, Dkt. Nos. 142-8, 199-4; McDonald's People Practices at 6, Dkt. No. 144-9 ("Franchisees are independent employers who make their own decisions and policies regarding employment-related matters pertaining to their employees."); Transcript of Summary Judgment Hearing ("Hearing Tr.") at 13:2-16, Dkt. No. 245 (counsel for plaintiffs acknowledging that the ultimate decision to hire or fire is made by Smith).

Nothing plaintiffs point to disturbs this conclusion. Plaintiffs argue that McDonald's has provided detailed recommendations to the Smiths on crew scheduling and staffing, but franchisee Michael Smith was adamant that these were just suggestions, and plaintiffs show nothing to the contrary *See* M. Smith Dep. Tr. 148:5-149:5. Plaintiffs say McDonald's extensively monitors and evaluates the Smith organization, *see* M. Smith Dep. Tr. 159:8-21 (average time in line for drive-thru); Deposition of Bruce Steinhilper ("Steinhilper Dep. Tr.") at 109:20-111:22, Dkt. Nos. 142-10, 199-6 (service time and order taker greetings); *id.* at 161:15-162:14 (employee feedback); Deposition of Steven Dubois ("Dubois Dep. Tr.") 68:22-25, Dkt. Nos. 175-11, 199-10 (customer feedback), and Michael Smith conceded that negative reviews could lead to the organization being denied eligibility for expansion. *See* M. Smith Dep. Tr. 150:18-151:19. But mere monitoring of these customer service metrics is not active employee control, and the fact that McDonald's would have to resort to economic and business relationship sanctions to motivate Smith to implement service changes underscores its lack of direct authority or control.

Other requirements that McDonald's imposes on franchisees also do not create a triable dispute. Plaintiffs contend that McDonald's trains franchisees' managers, *see* Ortega Dep. Tr. at 55:8-11, insists on being the owner or primary leaseholder for its locations, allowing it to enter the premises at any time, *see* Steinhilper Dep. Tr at 31:7-10, 31:25-32:13, requires franchisees to purchase furniture and uniforms through McDonald's-approved vendors, *see id.* at 34:2-20, and requires franchisees to install "bump bars" for employees to press to track their service times, *see* Deposition of Michael Lewis ("Lewis Dep. Tr.") at 49:4-20, 51:6-24, 53:24-54:3, Dkt. Nos. 142-12, 199-8 (tracking of service times using buttons and "bump bars"). But the aspects of Smith's operations that McDonald's may control through these requirements are not the type required to find that McDonald's "exercise[d] control over . . . wages, hours or working conditions."

1  *Martinez*, 49 Cal. 4th at 64. California courts have not extended joint employer liability to
2  situations where a franchisor does not have control over "hiring or firing, rate of pay, work hours
3  and conditions." *Aleksick v. 7-Eleven, Inc.*, 140 Cal. Rptr. 3d 796, 805-06 (Cal. Ct. App. 2012)
4  (holding that 7-Eleven did not employ its franchisees' employees despite requiring them to use its
5  payroll services). Smith had full and final say over those definitive aspects of the employment
6  relationship.

7  Plaintiffs go on to highlight several other specific aspects of the McDonald's-Smith
8  relationship as purported evidence of McDonald's direct employer control. None of these
9  examples demonstrate a triable issue of material fact:

10  **McDonald's-Provided Software.** Smith uses software called an ISP ("In-Store
11  Processor"), as well as a point of sale ("POS") system called "NewPOS." Lewis Dep. Tr. 44:7-20,
12  60:7-10. The ISP software is proprietary to McDonald's. Lewis Dep. Tr. at 60:17-23, 61:9-11.
13  All McDonald's franchised restaurants are required to use a POS system, *see* Lewis Dep. Tr. at
14  44:7-20, and franchisees are required to use the ISP for opening and closing the POS system, *see*
15  *id.* at 63:18-22. The ISP also has additional, optional functions, like timekeeping, crew
16  scheduling, inventory, and positioning. *See* Lewis Dep. Tr. 63:7-17, 79:4-9; M. Smith Dep. Tr.
17  192:4-193:10. The franchisees are required to use the POS to ring in sales of the restaurant, and it
18  too has optional functions, like recording time punches and timekeeping. *See* Lewis Dep. Tr.
19  54:21-25, 79:21-80:12.

20  As plaintiffs suggest, it is entirely possible that the alleged labor law violations at issue
21  here would not have occurred if the ISP had been programmed differently. The ISP's labor law
22  parameters were pre-programmed into it, and Smith and its management did not change them, *see*
23  M. Smith Dep. Tr. 56:9-21, or review or discuss the parameters with McDonald's, *see id.* at 76:5-
24  21. The only time Michael Smith was trained in using the ISP was in 1999. *See* M. Smith Dep.
25  Tr. 57:8-16. And Smith in fact relied on the ISP to calculate overtime. *See* M. Smith Dep. Tr.
26  74:7-10.

27  But simply providing the ISP software is not enough to convert McDonald's into an
28  employer. The California Court of Appeal has clearly held that franchisors who mandate use of

11

their payroll processing services are not liable as joint employers, even when the labor law violations at issue allegedly rose out of the way the franchisor set up the payroll system. *See Aleksick*, 140 Cal. Rptr. 3d at 798, 802-06 (7-Eleven not an employer even though its mandatory payroll service shaved off seconds recorded by franchisees' ISP); *Futrell*, 190 Cal. App. 4th at 1430-36 (payroll company not liable for allegedly failing to pay overtime). This is a sound result. Many companies supply employment-related software that might as a practical matter be necessary for a franchisee to use, and plaintiffs' position would unreasonably expose them to employer liability for programming or bugs that result in labor law violations.

McDonald's also provides a software tool called R2D2, which stands for McDonald's Regional Restaurant and Data Diagnostics system. *See* Lewis Dep. Tr. 86:15-87:13. R2D2 runs on a McDonald's-approved ISP. *See id*. The franchisee can choose to make the reports generated by R2D2 available to McDonald's. *See* Lewis Dep. Tr. 95:10-96:22. The parameters for determining what R2D2 considers a labor law violation are pre-set. *See* M. Smith Dep. Tr. 137:4-12. McDonald's witness, Michael Lewis, claimed that the R2D2 system was optional, though at least one document stated that McDonald's "will install" the software. *See* Lewis Dep. Tr. 86:15-21. Whether it is necessary or not is immaterial, however, to determining McDonald's liability, because it is undisputed that R2D2 is used only to monitor the performance of Smith's restaurants. It cannot be used to exercise control over wages, hours, and working conditions.

**Business consultants.** Plaintiffs also point to the fact that McDonald's hired business consultants who monitored data from Smith restaurants and spoke to Smith and its managers about practices and metrics that McDonald's wanted to improve. On some occasions, the business consultants spoke to general managers about staffing levels when Michael Smith and Guadalupe Ortega -- the Smith supervisor who managed employment and operations at the Smith restaurants -- were not present. *See* Dubois Dep. Tr. at 63:9-23. But again, none of this rises to the level of a triable material dispute. These facts are no different from ones in *Martinez*, where the fruit merchants were found not to be joint employers even though they "would . . . sometimes speak directly to the workers, pointing out mistakes in packing such as green and rotten berries." *Martinez*, 49 Cal. 4th at 76. And Michael Smith was clear that he sometimes rejected advice from

12

1   the business consultant, and plaintiffs do not argue otherwise.  *See* M. Smith Dep. Tr. 194:1-10.

2   **Property ownership.**  McDonald's differs from many franchisors in that it insists on being
3   either the owner or primary leaseholder of the land on which each franchisee's restaurant is built.
4   *See* Gordon Decl. ¶ 15; Steinhilper Dep. Tr at 31:7-10, 31:25-32:13.  One district court has relied
5   on a similar ownership structure to conclude that an alleged joint employer's "degree of control
6   over [the employee] plaintiffs may have been substantially greater than the produce merchants'
7   control over the *Martinez* plaintiffs."  *Carrillo v. Schneider Logistics Trans-Loading & Distrib.,*
8   *Inc.*, No. 2:11-cv-8557-CAS (DTBx), 2014 WL 183956, at *16 (C.D. Cal. Jan. 14, 2014).  The
9   ownership structure used by McDonald's and the defendant in *Carrillo* is certainly distinct from
10  the facts in *Martinez*, but it is a distinction without a difference.  The fact that McDonald's is the
11  owner or primary leaseholder for the land on which the Smith's restaurants sit makes it neither
12  more nor less likely that it can control the working conditions of Smith's employees.  There is
13  nothing in McDonald's landlord status that translates into direct workplace control over hiring,
14  firing and conditions.  As with the other aspects of the McDonald's-Smith relationship that
15  plaintiffs point to, the Court concludes that no joint employer relationship is created by
16  McDonald's property ownership practices.

17  **2.   Suffer or Permit to Work**

18  Plaintiffs' argument that McDonald's is a joint employer because it suffered or permitted
19  plaintiffs and putative class members to work largely recapitulates their argument about the
20  "exercise control" prong.  Plaintiffs particularly emphasize McDonald's extensive monitoring
21  programs, which they suggest gave or should have given McDonald's notice of Smith's labor law
22  violations and the power and obligation to use its franchisor influence to persuade Smith to mend
23  its ways.

24  This theory of joint liability is not viable under *Martinez*, 49 Cal. 4th at 69, and *Olmstead*,
25  2015 WL 1791440 at *7.  Those cases definitively found that an entity's ability to convince an
26  employer to carry out certain acts by threatening economic sanctions does not itself make it an
27  employer.  Consequently, even under plaintiffs' version of the facts, they are not joint employers
28  under this prong of *Martinez*.

### 3. Engage

As a final argument, plaintiffs contend that, even under the standard articulated by the California Supreme Court in *Patterson*, McDonald's should be considered an employer because it retained the ability to exercise control over matters directly related to plaintiffs' claims. The specifics plaintiffs point to, however, do not meaningfully distinguish this case from *Patterson*.

Plaintiffs again rely mainly on the extensive recommendations McDonald's and its personnel made to Smith for corrective employment actions. *See, e.g.*, Dkt. No. 206-6 at MCDOCH018772 (noting that Smith and McDonald's agreed to "[m]ake sure the staffing levels in the restaurant are correct during the peak / snack hours"); Dkt. No. 200-15 at 19 ("It is Field Service suggestion [sic] that you bench mark with operators in the region on how they are able to staff on Christmas Day."). Plaintiffs also point to the business consultants and "mystery shoppers" that McDonald's sends to Smith restaurants. But all this was, for the most part, true of the franchisor in *Patterson* as well. *See Patterson*, 60 Cal. 4th at 485 (the franchise owner "recalled two occasions on which Domino's had used unidentified ('mystery') callers to assess operations."); *id.* at 486 (Domino's area manager conducted "regular store inspections" in which she "would coach franchisees and employees on problems she saw with pizza-making, food safety, product packaging, store cleanliness, employee hygiene, customer orders, consumer complaints, and delivery procedures" and "recommended that Domino's send a notice of default when stores did not follow procedures that were contractually required"). These factors do not support imposition of joint employer liability on McDonald's.

### C. Ostensible Agency

As an alternative to proceeding on a true agency relationship, plaintiffs argue that Smith is McDonald's ostensible agent. If so, McDonald's would be liable to Smith's employees. *See* IWC Wage Order No. 5-2001 § 2(H) (defining employment to include "directly or indirectly, *or through an agent* or any other person . . . exercis[ing] control over wages, hours, or working conditions of any person"). Ostensible agency exists where (1) the person dealing with the agent does so with reasonable belief in the agent's authority; (2) that belief is "generated by some act or neglect of the principal sought to be charged," and (3) the relying party is not negligent. *Kaplan v.*

14

*Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747 (1997). *Patterson* expressly declined to consider whether the franchisor in that case was a joint employer under an ostensible agency theory. *Patterson,* 60 Cal. 4th at 494 n.18.

The named plaintiffs have submitted declarations stating that they believed McDonald's was their employer, in part because they wear McDonald's uniforms, serve McDonald's food in McDonald's packaging, receive paystubs and orientation materials marked with McDonald's name and logo, and, with the exception of Ms. Rodriguez, applied for a job through McDonald's website. *See* Declaration of Ernestina Sandoval ¶ 2, Dkt. No. 184; Declaration of Jasmine Hedgepeth ¶ 2, Dkt. No. 185; Declaration of Stephanie Ochoa ¶ 2, Dkt. No. 186; Declaration of Yadira Rodriguez ¶ 2, Dkt. No. 187. On similar facts, a number of courts have found that the test for ostensible agency is met. *See Kaplan*, 59 Cal. App. 4th at 747 (franchisee's authorized use of the franchisor's name and logo was sufficient to show that the franchisee was the ostensible agent of the franchisor); *Holt v. Kormann*, 2012 WL 2150070 (C.D. Cal. Jun. 12, 2012) (finding that a corporate defendant (KRR) could be held liable for the negligent misrepresentations of a man who was an ostensible agent of KRR because of "the purported agent's use of names and logos and the existence of a business relationship between the two entities."); *Butler v. McDonald's Corp.*, 110 F. Supp. 2d 62, 70 (D.R.I. 2000) (finding McDonald's franchise to be the ostensible agent of McDonald's under Rhode Island law); *Kuchta v. Allied Builders Corp.*, 21 Cal. App. 3d 541, 547 (1971). The McDonald's defendants provide no argument to the contrary. Moreover, the ostensible agency theory would appear to apply with equal force against both McDonald's USA and McDonald's, Inc., despite the fact that the latter has no contractual relationship with Smith, because the plaintiffs and putative class may well not distinguish between McDonald's corporate entities. Again, the McDonald's defendants provide no argument to the contrary.

Because there is evidence from which a jury could reasonably conclude that McDonald's and Smith shared an ostensible agency relationship, summary judgment is denied. McDonald's potential liability as a joint employer under ostensible agency will be resolved at trial.

## II. NEGLIGENCE

The parties' briefing on plaintiffs' negligence claim is rather cursory and undeveloped.

15

Both sides focus on the applicability of *Carrillo v. Schneider Logistics, Inc.*, CV-11-8557 CAS (DTBx) (C.D. Cal. May 13, 2013), which upheld negligence claims against Walmart at the motion to dismiss stage. Although it is plaintiffs who tout the May 13, 2013, *Carrillo* order and the McDonald's defendants who attempt to distinguish it, the order itself makes clear that plaintiffs cannot succeed as a matter of law on their negligence claim. The reason is California's "new right-exclusive remedy" doctrine, which refers to the general rule that "where a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy is exclusive." *Rojo v. Kilger*, 52 Cal. 3d 65, 79 (1990); May 13, 2013, *Carrillo* Order at 10-11. The California Court of Appeal has held that the doctrine precludes punitive damages for Labor Code violations where not provided for in the statute, because "where a statute creates new rights and obligations not previously existing at common law, the express statutory remedy is deemed to be the exclusive remedy available for statutory violations, unless it is inadequate." *Brewer v. Premier Golf Properties*, 86 Cal. Rptr. 3d 225, 232 (Cal. Ct. App. 2008) (internal quotation and alteration omitted); *see also* May 13, 2013, *Carrillo* Order at 11; *Santiago v. Amdocs, Inc.*, No. C 10-4317 SI, 2011 WL 1303395, at *3-4 (N.D. Cal. 2011) (refusing to permit conversion claim based on statutory wage and hour violations).

*Carrillo* accordingly held that "California law bars plaintiffs from utilizing common law claims to seek punitive damages or other relief not provided for in the California labor and employment statutes" and that "a plaintiff cannot simply place a common law label on a claim for violating California's labor and employment statutes and attempt to recover punitive damages or other extra-statutory remedies." May 13, 2013, *Carrillo* Order at 11. That is exactly what the negligence claims here seek to do: they duplicate the theories of liability plaintiffs assert under the California Labor Code. Consequently, this case differs from *Carrillo*, where the court only permitted the negligence claim to proceed because it was based on "negligently hiring, supervising, and retaining subcontractors" which the defendant admitted was not actionable under California's labor and employment statute. *Id.* at 11-12.

16

Because plaintiffs' negligence claim is barred by the new right-exclusive remedy doctrine, the Court grants the McDonald's defendants summary judgment on that claim.

## CONCLUSION

Summary judgment is granted on plaintiffs' negligence claims and on claims alleging that McDonald's is a direct join employer of plaintiffs or the putative class.  It is denied on the issue of McDonald's employer liability on ostensible agency grounds.[6]

**IT IS SO ORDERED.**

Dated: September 24, 2015

_____
JAMES DONATO
United States District Judge

---

[6] The Court also denies plaintiffs' request under Rule 56(d) for additional discovery, *see* Declaration of Matthew J. Murray, Dkt. No. 196-10, because the discovery disputes discussed in their declaration should have been brought using the letter brief procedure for discovery disputes set forth in the Court's Standing Order on Civil Cases, and because the requested discovery would not change the Court's conclusions even if it were to show what plaintiffs hope it will.